1

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

2

3

4

5

6

7

*Attorneys for Plaintiff*

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

| STACY PENNING, an individual, on behalf of himself, the general public, and those similarly situated, | CASE NO. |
|---|---|

11

12                          Plaintiff,

13         v.

14   NVIDIA CORPORATION,

15                          Defendant.

CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT

16

17

18

JURY TRIAL DEMANDED

19

20

21

22

23

24

25

26

27

28

- 1 -
CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 4

THE PARTIES .................................................................................................................... 6

JURISDICTION AND VENUE ......................................................................................... 6

SUBSTANTIVE ALLEGATIONS .................................................................................... 6

A.    Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers .............................................................................................................................. 6

B.    Defendant Falsely Informed Users That They Could Decline the Website's Use of "All" Cookies. ............................................................................................................................. 12

C.    The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendant's Website. ............................................................................... 22
    1.    Facebook Cookies ................................................................................................ 22
    2.    Google Cookies .................................................................................................... 27
    3.    TikTok Cookies .................................................................................................... 34
    4.    Adobe Cookies ..................................................................................................... 40
    5.    LiveRamp Cookies ............................................................................................... 45
    6.    Taboola Cookies ................................................................................................... 47
    7.    Salesforce Cookies .............................................................................................. 49
    8.    Additional Third Party Cookies ........................................................................... 50

D.    The Private Communications Collected are Valuable. ................................................. 58

PLAINTIFF'S EXPERIENCES ....................................................................................... 59

CLASS ALLEGATIONS .................................................................................................. 63

CAUSES OF ACTION ...................................................................................................... 65

First Cause of Action: Invasion of Privacy ...................................................................... 65

Second Cause of Action: Intrusion Upon Seclusion ........................................................ 68

Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ........................................................................................... 70

Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ................................................................... 75

Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation ............... 76

CLASS ACTION COMPLAINT

Sixth Cause of Action: Unjust Enrichment..................................................................... 79

CLASS ACTION COMPLAINT

1

2      Plaintiff Stacy Penning ("Plaintiff") brings this action on behalf of himself, the general

3  public, and all others similarly situated against NVIDIA Corporation ("Defendant" or

4  "NVIDIA"). Plaintiff's allegations against Defendant are based upon information, belief and

5  upon investigation of Plaintiff's counsel, except for allegations specifically pertaining to

6  Plaintiff, which are based upon Plaintiff's personal knowledge.

7                                    **INTRODUCTION**

8      1.      This Class Action Complaint concerns an egregious privacy violation and total

9  breach of consumer trust in violation of California law. When consumers visit Defendant's

10 ecommerce website (www.nvidia.com, the "Website"), Defendant displays to them a popup

11 cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but

12 expressly gives users the option to control how they are tracked and how their personal data is

13 used. Defendant assures visitors that they can choose to "Manage Cookies" as shown in the

14 following screenshot:

15

16

17     2.      Like most internet websites, Defendant designed the Website to include

18 resources and programming scripts from third parties that cause those parties to place cookies

19 and other similar tracking technologies on visitors' browsers and devices and/or transmit

20 cookies along with user data. However, unlike other websites, Defendant's Website offers

21 consumers a choice to browse without being tracked, followed, and targeted by third party data

22 brokers and advertisers. But, Defendant's promises are outright lies, designed to lull users into

23 a false sense of security. Even after users elect to "Decline All" cookies in the Cookie Settings

24 window, Defendant surreptitiously causes several third parties—including Meta Platforms, Inc.

25 (formerly Facebook), Google LLC (DoubleClick), ByteDance Ltd. (TikTok), Adobe, Inc.

26 (omtrcd.net), LiveRamp Holdings, Inc. (rlcdn.com), Taboola.com, Ltd., Salesforce, Inc.

27 (Evergage), PubMatic, Inc., Microsoft Corp. (AppNexus), LinkedIn Corporation (a subsidiary

28 of Microsoft Corp.), X Corp. (Twitter), Dun & Bradstreet Holdings, Inc. (Eyeota), Yahoo, Inc.,

- 4 -

NextRoll, Inc. (Adroll.com), Magnite, Inc. (Rubicon Project), Index Exchange, Inc. (Casale Media), Bidswitch, Inc., TripleLift, Inc. (3lift.com), Teads Holding Co. (Outbrain) (outbrain.com), and OpenX Technologies, Inc. (the "Third Parties") —to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Website.

3.      Contrary to their express declination of cookies and tracking technologies on the Website, Defendant nonetheless caused cookies, including the Third Parties' cookies, to be sent to Plaintiff and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These third-party cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

4.      The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

5.      This type of tracking and data sharing is exactly what the Website visitors who clicked or selected the "Decline All" button and/or by toggled off "Performance Cookies" and "Advertising Cookies" in the Website's Cookie Settings window sought to avoid. Defendant falsely told Website users that it respected their privacy and that they could avoid tracking and data sharing when they browsed the Website. Despite receiving notice of consumers' express declination of consent, Defendant defied it and violated state statutes and tort duties owed to Plaintiff and those similarly situated Website users.

## THE PARTIES

6.      Plaintiff Stacy Penning is, and was at all relevant times, an individual and resident of El Cerrito, California. Plaintiff intends to remain in California and makes his permanent home there.

7.      Defendant NVIDIA Corporation is a Delaware corporation with its headquarters and principal place of business in Santa Clara, California.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiff and Defendant are citizens of different states.

9.      The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

10.      Further, the Private Communications and data which Defendant causes to be transmitted to Third Parties are routed through servers located in California.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

12.      Plaintiff accordingly alleges that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

**A.      Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie Trackers.**

13.      Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the

Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address so that the Website server to knows where to send the HTTP response.

14.    An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

15.    As a result, Defendant knew that the devices used by Plaintiff and Class members to access the Website were located in California.

16.    Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

17.    The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the

CLASS ACTION COMPLAINT

website to identify the device making the requests, and to record a session showing how the user interacts with the website.

18.    First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

19.    A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com; td.doubleclick.net; analytics.tiktok.com; omtrcd.net, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

20.    As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;

- **Visit History**: Information about the frequency and total number of visits to the Website;

- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;

CLASS ACTION COMPLAINT

- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;

- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;

- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;

- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;

- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;

- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or

- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

21.     Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g.,

CLASS ACTION COMPLAINT

delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data.

22.     Defendant is a technology company best known for designing graphics processing units (GPUs), which are widely used in gaming, professional visualization, data centers, and artificial intelligence. In addition to hardware, NVIDIA develops software platforms and systems for AI, machine learning, and accelerated computing. Defendant also owns and operates the Website, which allows visitors to receive information about its hardware and software products and purchase products. As they interact with the Website (e.g., by entering data into forms, clicking on links, and making selections), Website users communicate Private Communications to Defendant, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

23.     Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies.  Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the software code of its Website, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or transmitted to third parties.

24.     Defendant admitted that the Website allows third parties to collect user data with cookies in its Privacy Policy as follows:

CLASS ACTION COMPLAINT

If you visit any of our NVIDIA websites, we or our third-party partners collect information using cookies, web beacons, or log file information. Please see our Cookie Policy for more details.[1]

25.     Further, Defendant explained the third-party cookies it used on the Website as follows in its Cookie Policy:

A cookie is a small data file made up of letters and numbers which is placed by a website on the device you use to access the Internet. Cookies serve different purposes, and may be tied to personal information. At NVIDIA, we use cookies to help deliver and improve our websites (such as NVIDIA.com, Geforce.com, and Developer.nvidia.com) through information about website usage and settings, as described below. How we use cookies is governed by this Cookie Policy and by our Privacy Policy.[2]

26.     Further, Defendant described the categories of cookies used on the Website as follows in its Cookie Policy:

**Performance Cookies**

These cookies are used to better understand and optimize the web experience. These cookies collect information such as pages visited or purchased made through our eStore.

**Advertising Cookies**

These cookies are used to personalize your web experience with relevant advertisements. These cookies collect information such as pages visited or purchases made through our eStore.

**Required Cookies**

These cookies are required for the website to properly function on your device. These cookies collect information such as location (for language settings), account management, event registration, driver installs, or email preferences.

---

[1] NVIDIA Privacy Policy (Effective date September 22, 2025) (available at https://www.nvidia.com/en-us/about-nvidia/privacy-policy. Similar language has appeared in prior versions of NVIDA Privacy Policy.

[2] NVIDIA Website Cookie Policy (as it appeared on 7/4/2024) (available at https://www.nvidia.com/en-us/about-nvidia/cookie-policy/) (the "Cookie Policy"). Defendant has subsequently updated its Cookie Policy but, based on information and belief, this version was in effect at the time of Plaintiff's rejection of cookies on the Website.

1

**B.    Defendant Falsely Informed Users That They Could Decline the Website's Use of "All" Cookies.**

2

27.    When Plaintiff and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "NVIDIA uses cookies to enable and improve the use of the website…You can manage your cookie settings by clicking 'Manage Cookies' or going to the NVIDIA Privacy Center." Accordingly, the banner then purported to provide users the opportunity to "Manage Cookies" by clicking the button as shown in the following screenshot from the Website:



28.    Plaintiff and other Website users who clicked or selected the "Manage Cookies" button were then directed to Defendant's "Cookie Settings" window. There, Defendant further represented, "NVIDIA websites use cookies to deliver and improve the visitor experience. Learn more about the cookies we use on our Cookie Policy page." The "Cookie Settings" window identified three categories of cookies in use on the Website, including "Performance Cookies" and "Advertising Cookies," each of which could be turned "off" by adjusting a toggle or setting to do so. Defendant represented that "Required Cookies" are "required for the site to function" and "cannot be turned off[.]" Besides the toggles or settings available to decline specific categories of cookies, there was also a "Decline All" button that users could click or select, as shown in the following screenshot:

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



25     29.     Users who clicked or selected the "Decline All" button and/or toggled off

26 "Performance Cookies" and "Advertising Cookies," thereby indicating their choice and/or

27 agreement to decline "All" cookies and tracking technologies in use on the Website, including

28 all Performance and Advertising cookies (other than those "Required Cookies" needed for the

CLASS ACTION COMPLAINT

Website to function), could then continue to browse the Website, as the popup cookie consent banner and Cookie Settings window disappeared.

30.    Defendant's popup cookie consent banner and Cookie Settings window led Plaintiff, and all those Website users similarly situated, to believe that they declined "All" cookies and tracking technologies, especially those used to "understand where people most engage with links" and "build a profile of [user] interests to show [users] relevant ads on other sites." The banner further reasonably led Plaintiff and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "Decline All" cookies button.

31.    Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiff's or other users' wishes. When Plaintiff and other Website users clicked or selected the "Decline All" cookies button and/or toggled off "Performance Cookies" and "Advertising Cookies," they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website. Nevertheless, Defendant caused the Third Party tracking cookies to be placed on Website users' browsers and devices and/or transmitted to the Third Parties along with user data.

32.    In particular, when users clicked or selected the "Decline All" cookies button and/or toggled off "Performance Cookies" and "Advertising Cookies, Defendant nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers,

CLASS ACTION COMPLAINT

and/or geolocation data. In other words, even when consumers like Plaintiff tried to protect their privacy by declining "All" cookies, Defendant failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

33.    Some aspects of the operations of the Third Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshots, obtained using one such tool, show examples of the Third Parties' cookies being transmitted from a Website user's device and browser to the Third Parties even after the user clicked or selected the "Decline All" button on the Website's Cookie Settings window:

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**CLASS ACTION COMPLAINT**



**CLASS ACTION COMPLAINT**



CLASS ACTION COMPLAINT



**CLASS ACTION COMPLAINT**

34.    The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third party websites while the user visited and interacted with Defendant's Website at https://www.nvidia.com. The screenshots depict only network traffic occurring *after* the user declined "All" cookies using the Cookie Settings window. As shown above, despite the user's declination of "All" cookies, the user's interactions with the Website resulted in the user's

CLASS ACTION COMPLAINT

browser making a large number of GET and POST HTTP requests to third party web domains such as www.facebook.com, td.doubleclick.net, analytics.tiktok.com, omtrcd.net, and many others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Website caused third-party cookie data and users' Private Communications to be transmitted to Third Parties, even after consumers declined all cookies and tracking technologies by clicking or selecting the "Decline All" cookies button. All of these network calls are made to the Third Parties without the user's knowledge, and despite the user's declination of "All" cookies.

35.    Plaintiff's and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

36.    As users interact with the Website, even after clicking or selecting the "Decline All" cookies button, thereby declining the use of cookies and similar technologies for performance analysis and advertising, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications are sent to third parties, alongside the cookie data. The third-party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be transmitted to the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing

CLASS ACTION COMPLAINT

purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

37.     The Third Party code that the Website causes to be loaded and executed by the user's browser becomes a wiretap when it is executed because it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

**C.      The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendant's Website.**

**1.      The Website Causes the Interception of the Contents of Communications**

38.     The Website includes search bars and forms where users input information. For example, below are screenshots of the search bar on the Website where users can type into the search bar to cause the Website to search its contents.



**CLASS ACTION COMPLAINT**



39.     When Plaintiff and other Website users input the information into the search bar, they are intending to communicate with the Website the contents of the search to receive the information they are interested in.

40.     Instead, the software on the Website causes the contents of the communication to be intercepted while in transit.

41.     For example, the Website sends users' search strings to Facebook—even after consumers have declined all cookies. In the example below, the test string "privacy" was sent to Facebook along with cookie data:



## 2.     Facebook Cookies

42.     Defendant causes third-party cookies to be transmitted to and from Website users' browsers and devices to and from the **facebook.com** domain, even after users elect to

**CLASS ACTION COMPLAINT**

"Decline All" cookies (including all Performance and Advertising cookies) and/or to toggle off "Performance Cookies" and "Advertising Cookies". This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[3] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

43.    Cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Website causes the following data to be sent to Meta when the user enters a search term into the Nvidia Website:

| **Request** Header Query Body Cookies Raw | Summary + |
|---|---|
| Key | Value |
| id | 161755414605325 |
| ev | PageView |
| dl | https://www.nvidia.com/en-us/search/?page=1&q=privacy%20is%20important&sort=relevance |
| rl | https://www.nvidia.com/en-us/geforce/graphics-cards/ |
| if | false |
| ts | 1719604127695 |
| sw | 1920 |
| sh | 1080 |
| v | 2.9.159 |
| r | stable |
| ec | 2 |
| o | 30 |
| cs_est | true |
| ler | empty |
| cdl | API_unavailable |
| it | 1719604025550 |
| coo | false |
| dpo | LDU |
| dpoco | 0 |
| dpost | 0 |
| rqm | GET |

Preview Quer

---

[3] https://www.facebook.com/privacy/policies/cookies/.

CLASS ACTION COMPLAINT

44.     The "ev" parameter is short for "event." In this instance, the event is a "PageView."

45.     The "dl" parameter is the "Document Location." It tells Facebook the specific webpage on which the Event occurred – in this case, https://www.nvidia.com/en-us/search/?page=1&q=privacy%20is%20important&sort=relevance. This also discloses to Facebook the user's search query: "privacy is important."

46.     The "ts" parameter corresponds to a "Timestamp," and tells Facebook the exact time—down to the millisecond—at which the user viewed the page.

47.     The "sw" and "sh" parameters stand for "screen width" and "screen height," and correspond to the display the user was viewing when the event was recorded.

48.     Cookies are sent along with all data transmissions to Meta. For instance, the following cookies were sent along with the AddToCart event:

| Request | Header | Query | Body | Cookies | Raw | Summa (Fr) |
|---|---|---|---|---|---|---|
| **Key** | | **Value** | | | | |
| sb | | pQI9ZkmdCAXYrQSQXngSSMep | | | | |
| datr | | pQI9Zu6rOGZxJLTz7YrqaTVV | | | | |
| c_user | | 100076133960803 | | | | |
| ps_n | | 1 | | | | |
| xs | | 11%3Adi1FNrtx5ix0HA%3A2%3A171527441 0%3A-1%3A-1%3A%3AAcVh1547GCKJnGyv jMaUEMTJP0UrmrTFxLBsDo-pqw | | | | |
| fr | | 1jvLdroEbqYmCRu9g.AWV2IzrhppEBpcTVNrh DCqIaQVU.Bmfvv1..AAA.0.0.BmfwGM.AWXx M7L0HEQ | | | | |

49.     Defendant identified the fr cookie shown above as an "Advertising Cookie" used on the Website in the Cookie Policy and described its purpose as follows:

| fr | Persistent cookie (expires after 1 month) | Third party (Facebook) | Used by Facebook to enable ad delivery or retargeting. |
|---|---|---|---|

50.     The c_user cookie shown above enables Facebook to identify a specific user when they are logged in to their account. The c_user cookie stores a user's unique ID, which is

**CLASS ACTION COMPLAINT**

associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

51. In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies enable Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[4] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[5]

52. The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[6]

53. Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a

---

[4] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect

[5] https://allaboutcookies.org/what-data-does-facebook-collect.

[6] *Id.*

**CLASS ACTION COMPLAINT**

newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

54.     Further, along with all of this data, the Facebook software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Facebook:

| user-agent | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/ 126.0.0.0 Safari/537.36 |
| --- | --- |

55.     The "user-agent" corresponds to the device and browser that the user has used to access the Website.

56.     Finally, the data sent to Facebook contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

### 3.     Google Cookies

57.     Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users choose to "Decline All" cookies (including Performance and Advertising cookies) and/or to toggle off "Performance Cookies" and "Advertising Cookies," to and from the **doubleclick.net** domain. This domain is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in performing data collection, behavioral analysis, user retargeting, and analytics.[7] Google serves targeted ads to web users across Google's ad network, which

---

[7] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[8] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[9]

58.    Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[10] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

59.    Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create

---

[8] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[9] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=1196213575075458908-NC).

[10] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=1196213575075458908-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

CLASS ACTION COMPLAINT

reports that provide insights into [] business[es]."[11] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[12]

60.    Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[13]

---

[11] How Google Analytics Works (available at https://support.google.com/analytics/answer/12159447?hl=en).

**[12]** Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[13] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

CLASS ACTION COMPLAINT

61.    For example, the Google software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Google's domain, at https://www.googleads.g.doubleclick.net:



| Key | Value |
| --- | --- |
| gtm | 45be46q0v885977293za200 |
| guid | ON |
| hn | www.googleadservices.com |
| npa | 0 |
| pscdl | noapi |
| random | 1719604025741 |
| ref | https://www.nvidia.com/en-us/geforce/graphics-cards/ |
| rfmt | 3 |
| tag_exp | 0 |
| tiba | Onsite Search: Find What You Seek | NVIDIA |
| u_h | 1080 |
| u_w | 1920 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%2FA)Brand;8.0.0.0|Chromium;126.0.6478.127|Google%20Chrome;126.0.6478.127 |
| uam | |
| uamb | 0 |
| uap | Windows |
| uapv | 10.0.0 |
| uaw | 0 |
| url | https://www.nvidia.com/en-us/search/?page=1&q=privacy&sort=relevance |
| userId | replace with value |

CLASS ACTION COMPLAINT

62.    The "npa" parameter refers to "Non-Personalized Ads." When npa is set to 1, it indicates non-personalized ads preference is enabled. Here, npa is set to 0, indicating that standard (personalized) ads are enabled.

63.    The "url" and "tiba" parameters disclose to Google the exact webpage and title that the user was viewing. In this instance, the url discloses the search string the user entered on the website: "privacy."

64.    The "u_h" and "u_w" parameters correspond to the user's screen height and width.

65.    Along with this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the following cookies to be sent to Google's domain:



66.    Google documentation confirms that the IDE cookie is used for advertising. Specifically, it is "used to show Google ads on non-Google sites."[14]

67.    Defendant identified Google's IDE cookie as an "Advertising Cookie" used on the Website in the Cookie Policy and described its usage as follows:

| IDE | Persistent cookie (expires after 1 year) | Third party (doubleclick) | Used by Google DoubleClick to register and report the website user's actions after viewing or clicking one of the advertiser's ads with the purpose of measuring the efficacy of an ad and to present targeted ads to the user. |
| --- | --- | --- | --- |

---

[14] https://policies.google.com/technologies/cookies?hl=en-UST

68.     Further, along with all of this data, the Google software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Google:

| user-agent | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/ 126.0.0.0 Safari/537.36 |

69.     As discussed above with respect to Facebook, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

70.     Finally, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

71.     Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

72.     Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as rebranding their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your

**CLASS ACTION COMPLAINT**

audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[15]

73.    Defendant described the purpose of Google's cookies as follows in the Website Google Policy:

> This domain is owned by Google Inc. Although Google is primarily known as a search engine, the company provides a diverse range of products and services. Its main source of revenue however is advertising. Google tracks users extensively both through its own products and sites, and the numerous technologies embedded into many millions of websites around the world. It uses the data gathered from most of these services to profile the interests of web users and sell advertising space to organisations based on such interest profiles as well as aligning adverts to the content on the pages where its customer's adverts appear.

74.    Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[16] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

---

[15] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

[16] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

CLASS ACTION COMPLAINT

4.    **TikTok Cookies**

75.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Decline All" cookies including all Performance and Advertising cookies and/or to toggle off "Performance Cookies" and "Advertising Cookies," to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by ByteDance Ltd., known for short-form video sharing. [17] The TikTok platform is used to create and share videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[18]

76.    TikTok utilizes analytics.tiktok.com cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Website). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[19] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data to observe and evaluate TikTok user behavior.

77.    These cookies enable TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and

---

[17] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[18] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[19] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user

identifiers, and (xi) geolocation data in the form of the IP address.[20]

78.     For example, the TikTok software code that Defendant causes to be stored on and

executed by the Website user's device causes the following data to be sent to TikTok's domain,

at https://analytics.tiktok.com:



---

[20] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel
(https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en);
TikTok for Business: Advanced Matching for Web (available at
https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business:
About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

```
        responsivegrid/nv_container_1965276/nv_teaser_copy.
        coreimg.100.410.jpeg/1694172071136/
        geforce-gtx-16-series.jpeg\"},\"subscopes\":[],
        \"type\":\"http://schema.org/ImageObject\"}]",
  9     "open_graph": "{\"og:site_name\":\"NVIDIA\",
        \"og:type\":\"Website\",\"og:url\":\"https://www.nvidia.
        com/en-us/geforce/graphics-cards/\",
        \"og:title\":\"NVIDIA GeForce Graphics Cards\",
        \"og:description\":\"GeForce RTX 40, 30, 20 series &
        GTX 16 series.\",\"og:image\":\"https://www.nvidia.com/
        content/dam/en-zz/Solutions/geforce/ada/graphics-cards/
        geforce-ada-4090-web-og-1200x630@2x.jpg\",
        \"twitter:card\":\"summary_large_image\",
        \"twitter:site\":\"@NVIDIA\",
        \"twitter:creator\":\"@NVIDIAGeForce\",
        \"twitter:title\":\"NVIDIA GeForce Graphics Cards\",
        \"twitter:url\":\"https://www.nvidia.com/en-us/geforce/
        graphics-cards/\",\"twitter:description\":\"Explore
        NVIDIA GeForce graphics cards. RTX 40 series, RTX 30
        series, RTX 20 series and GTX 16 series.\",
        \"twitter:image\":\"https://www.nvidia.com/content/dam/
        en-zz/Solutions/geforce/ada/graphics-cards/
        geforce-ada-4090-web-og-1200x630@2x.jpg\"}"
 10   },
 11   "page_trigger": "Click"
 12 },
 13 "context": {
 14   "ad": {
 15     "jsb_status": 2,
 16     "sdk_env": "external"
 17   },
```

CLASS ACTION COMPLAINT

```
18 ∨    "device": {
19         "platform": "pc"
20       },
21       "index": 0,
22 ∨    "library": {
23         "name": "pixel.js",
24         "version": "2.2.0"
25       },
26 ∨    "page": {
27         "load_progress": "2",
28         "referrer": "https://www.nvidia.com/en-us/",
29         "url": "https://www.nvidia.com/en-us/geforce/
               graphics-cards/"
30       },
31       "pageview_id": "pageId-1719603824484-7435376964767.0.0",
32 ∨    "pixel": {
33         "code": "C2V17UTEERJ9G00M6RM0",
34         "codes": "C2V17UTEERJ9G00M6RM0|C2DMTL2QV1400RDIK620",
35         "runtime": "1"
36       },
37       "session_id":
           "b9e54b2f-3586-11ef-9b9c-02001704b732::qPUPoWVZXShfn0PbXsQ
           n",
38 ∨    "user": {
39         "anonymous_id": "D4fWm7WF0wA1gaYuUAr8QYaOdmd"
40       },
41       "userAgent": "Mozilla/5.0 (Windows NT 10.0; Win64; x64)
           AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.0.0
           Safari/537.36",
42       "variation_id": "test_2_single_track"
43     },
```

CLASS ACTION COMPLAINT

```
44      "event_id": "",
45      "is_onsite": false,
46      "message_id": "messageId-1719604002911-6453556665542",
47      "properties": {},
48  ∨   "signal_diagnostic_labels": {
49  ∨       "hashed_email": {
50              "label": "missing"
51          },
52  ∨       "hashed_phone": {
53              "label": "missing"
54          },
55  ∨       "raw_auto_email": {
56              "label": "missing"
57          },
58  ∨       "raw_auto_phone": {
59              "label": "missing"
60          },
61  ∨       "raw_email": {
62              "label": "missing"
63          },
64  ∨       "raw_phone": {
65              "label": "missing"
66          }
67      },
68      "timestamp": "2024-06-28T19:46:42.911Z"
69  }
```

79.     The data includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[21]

80.     The data discloses extensive information to TikTok regarding the user's activity on the Website. For example, the "meta" attribute discloses the title of the webpage, as well as keywords relevant to the webpage. The "microdata" attribute discloses the images that the user viewed on the webpage--down to their exact filenames and dimensions. The "page.url" attribute discloses the url of the webpage the user is viewing (here, https://www.nvidia.com/en-us/geforce/graphics-cards). The data also discloses the exact time this action occurred, down to the millisecond.

---

[21] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/).

CLASS ACTION COMPLAINT

81.    Along with this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the "_ttp" cookie to be sent to TikTok's domain:



82.    According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[22]

83.    Further, along with all of this data, the TikTok software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to TikTok:

| user-agent | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.0.0 Safari/537.36 |
|---|---|

As discussed above with respect to Facebook, the "user-agent" corresponds to the device and browser that the user has used to access the Website.

84.    Finally, the data sent to TikTok includes the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

85.    By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of

---

[22] *See* TikTok for Business: Using Cookies with TikTok Pixel
(available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

CLASS ACTION COMPLAINT

TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyze user responses to ads and content).[23]

86.    Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. TikTok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[24]

### 5.    Adobe Cookies

87.    Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users choose to "Decline All" cookies including all Performance and Advertising cookies and/or to toggle off "Performance Cookies" and "Advertising Cookies," to and from the **omtrdc.net** domain and the Adobe-owned-and-hosted **smetrics.nvidia.com** domain. These domains are associated with Adobe Inc.'s Audience Manager, a data management platform, Adobe's Marketing Cloud, and Adobe's Experience Cloud Identity Service, a service which provides a universal, persistent ID to identify visitors across all Adobe products. Defendant described the function of Adobe cookies as follows in its Website Cookie Policy: "This domain is owned by Adobe Audience Manager. The main business activity is online profiling for targeted advertising."

88.    These cookies are used to assign a unique identifier to each site visitor, which enables Adobe to consistently recognize and track users across different sessions and domains (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and

---

[23] *See* TikTok for Business: Using Cookies with TikTok Pixel
(available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[24] TikTok for Business: How to set up Automatic Advanced Matching (available at
https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).

evaluate user behavior online.[25] These cookies enable Adobe to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) interests and preferences; and (vi) session information.[26]

89.    Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics, create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[27]

90.    For example, the Adobe software code that Defendant causes to be stored on and executed by the Website user's device causes the following query string and cookie data to be sent to Adobe's domain, at https://nvidia.tt.omtrdc.net:



---

[25] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics); *see also* Adobe Experience League: Audience Manager cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager).

[26] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).

[27] *See, e.g.,* Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).

91.    The "sessionId" key is designed to persist during the entirety of the user's visit, enabling Adobe to link the user's pageviews across the website.

92.    According to Adobe documentation, the cookie beginning in "s_vi" "[s]tores a unique visitor ID and timestamp."[28]  "Each visitor ID is associated with a visitor profile on Adobe servers," and visitor profiles are set to persist for one year.[29]

93.    Defendant identifies the cookie beginning in "s_vi" as a "Performance Cookie" in its Website Cookie Policy and describes this cookie as follows:



94.    Likewise, the following type of data is sent to Adobe's domain at https://smetrics.nvidia.com after users have rejected all cookies:

---

[28] https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics.

[29] *Id.*

CLASS ACTION COMPLAINT

https://smetrics.nvidia.com/b/ss/nvdaglobalprod/1/JS-
8%205%20420&mid=20265760501848647141206737764232151401
tps%3A%2F%2Fwww.nvidia.com%2Fen-us%2Fsearch%2F%3Fpage
D%3Dv10&v10=search%3Arepeat%3Asuccess%3Aprivacy%20is%
important&pe=lnk_o&pev2=search%3Arepeat%3Asuccess%3Apriv

Request  Header  Query  Body  Cookies  Raw | Summary  +

| Key | Value |
| --- | --- |
| AQB | 1 |
| ndh | 1 |
| pf | 1 |
| t | 28/5/2024 12:48:48 5 420 |
| mid | 20265760501848647141206737764232151401 |
| ce | UTF-8 |
| ns | nvda |
| cdp | 2 |
| fpCookieDomainPeriods | 2 |
| pageName | nv:search |
| g | https://www.nvidia.com/en-us/search/?page=1&q=privacy&sort=relevance |
| cc | USD |
| events | event10,event21 |
| c10 | D=v10 |
| v10 | search:repeat:success:privacy is important:nv:search |
| c20 | privacy is important |
| v20 | privacy is important |
| pe | lnk_o |
| pev2 | search:repeat:success:privacy is important:nv:search |
| s | 1920x1080 |
| c | 24 |
| j | 1.6 |
| v | N |
| k | Y |
| bw | 708 |
| bh | 953 |
| mcorgid | F207D74D549850760A4C98C6@AdobeOrg |
| lrt | 44 |
| AQE | 1 |

95.   Along with that data, the following extensive cookie data are sent to Adobe's smetrics.nvidia.com domain:

GET
200
```
https://smetrics.nvidia.com/b/ss/nvdaglobalprod/1/JS-
8%205%20420&mid=202657605018486471412067377642321514(
tps%3A%2F%2Fwww.nvidia.com%2Fen-us%2Fsearch%2F%3Fpage
D%3Dv10&v10=search%3Arepeat%3Asuccess%3Aprivacy%20is%
important&pe=lnk_o&pev2=search%3Arepeat%3Asuccess%3Apri
```

Request  Header  Query  Body  **Cookies**  Raw  Summary  +

| Key | Value |
| --- | --- |
| at_check | true |
| nvweb_A | cd38578a-f088-4581-9680-46911a61a2f3 |
| s_ecid | MCMID%7C20265760501848647141206737764232151401 |
| AMCVS_F207D74D5 49850760A4C98C6 %40AdobeOrg | 1 |
| AMCV_F207D74D54 9850760A4C98C6% 40AdobeOrg | 179643557%7CMCMID%7C20265760501848647141206737764 232151401%7CMCAID%7CNONE%7CMCOPTOUT-1719610956s%7 CNONE%7CvVersion%7C5.5.0 |
| _cs_mk | 0.588733476318981_1719603756629 |
| ak_bmsc | A391E86637DEAF2A3DDB3DFBAF98B206~00000000000000000 000000000000~YAAQzunHF93mMFSQAQAAfQBfYBj7cWyau9Ark/ h1ZpgkgvhoZnwgt7SyRCsS2z2CRZqKaUaKygYFIy0oGOopLWRzD6A 5Qul0opPpwX4k5gXedtF+veNIPxoBecXZ/ FNSj+rVJilbHJqXjbJX+TCYZZ+ +rXkS85TEFhORy7I9n8iDeqv+jk1doYy6P+sfHk9p6mnz7BEIvhto8Be8 XOsDmx5u+/UrPQqmQyQ/ ytnZ45bdVT+b8CJRYEr5mbfIwiNSPNowU7qyiehOafd8mnRhqtud6Ta NgT4vfplXU7oA+FCyPjpEntkaok5RwWd1CxbbkSUjbUGrv6w3QXHOv YMZK0Vooz5GxP07nhJZJ2JhMMRZ2lI5CIrIJAnLp9l/ Et1iQQexRYISOpThNmN2AuVsBoVtHPe8kv4g |
| _gcl_au | 1.1.116464114.1719603758 |
| s_cc | true |
| _cs_c | 0 |
| _hjSession_3655182 | eyJpZCI6ImY1NTIhMWVmLTYwNjMtNDkyYi1hYzhlLTQ0NTljZTgyNDIiZ ClsImMiOjE3MTk2MDM3NTc3NTc3NTkTsInMiOjAsInIiOjAsInNljowLCJzcil6M Cwic2UiOjAsImZzljoxLCJzcCI6MX0= |
| _vwo_uuid_v2 | D8F250E0294AEE4C042C3396214604F39| cc6ef2cb8b04477f62d37d2396d0188c |
| _biz_uid | 09bed99a73f0459cefb5bfc708c4fcd6 |
| _hly_vid | 02dd56f0-104e-418e-b9a9-7435093846eb |
| _vis_opt_s | 1%7C |
| _vis_opt_test_cookie | 1 |
| _biz_flagsA | %7B%22Version%22%3A1%2C%22Ecid%22%3A%22-621273206% 22%2C%22ViewThrough%22%3A%221%22%2C%22XDomain%22% 3A%221%22%2C%22Mkto%22%3A%221%22%7D |
| _fbp | fb.1.1719603758548.124930743920596034 |
| OptanonConsent | isGpcEnabled=0&datestamp=Fri+Jun+28+2024+12%3A43%3A14+G MT-0700+ (Pacific+Daylight+Time)&version=202304.1.0&browserGpcFlag=0&isl ABGlobal=false&hosts=&consentId=30953c2d-2299-40ee- a4d5-36bd8214f436&interactionCount=1&landingPath=https%3A% 2F%2Fstore.nvidia.com%2Fen- us%2Fconsumer%2F%3Fpage%3D1%26limit%3D9%26locale%3Den -us%26gpu%3DRTX%25204090%2CRTX%25204080%2CRTX%252 04070%2520Ti%2CRTX%25204070%2CRTX%25204060%2520Ti% 2CRTX%25204060%2CRTX%25204070%2520SUPER%2CRTX%25 204070%2520Ti%2520SUPER%2CRTX%25204080%2520SUPER% 26category%3DGPU%2CDESKTOP&groups=C0001%3A1%2CC0002 %3A1%2CC0004%3A1%2CC0003%3A1 |

CLASS ACTION COMPLAINT

| | |
|---|---|
| _hjSessionUser_365 5182 | eyJpZCl6IjEzNGIwYjRjLTUxODYtNWQ3Ny04MDgxLTAxNDA3Yji4NGYz YSIsImNyZWF0ZWQiOjE3MTk2MDM3NTc3NTgsImV4aXN0aW5nIjp0c nVlfQ== |
| _evga_7830 | {%22uuid%22:%224ef9d671315ab74b%22} |
| _sfid_eb78 | {%22anonymousId%22:%224ef9d671315ab74b%22%2C%22conse nts%22:[{%22consent%22: {%22purpose%22:%22Personalization%22%2C%22provider%22:%2 2Consent%20Manager%22%2C%22status%22:%22Opt%20In%22} %2C%22lastUpdateTime%22:%222024-06-28T19:43:43.817Z%22 %2C%22lastSentTime%22:%222024-06-28T19:43:43.843Z%22}]} |
| _tt_enable_cookie | 1 |
| _ttp | D4fWm7WF0wA1gaYuUAr8QYaOdmd |
| _rdt_uuid | 1719603757017.79e975f8-8a0a-47f9-a8f3-b2bbc2697b47 |
| s_getNewRepeat | 1719604024966-New |
| bm_sv | AB5DB0ACA910536C883325CE1A4059D3~YAAQBE5DF52/ AWCQAQAACRdjYBhKPd6mvN2b4sn1mzVxUUa4Dkom2kEfGtCJ3Pd4 44O0/aZ++7JXj7Yp//TTx5KK/ FTmgrySxWAgmZ1pRlRcqFVlSXC1q8i6xrHeOXO1afds/ QrAg3AckUwPvyYUiAsu2uQddp9TbZ3VDmIxPiMA8vIzeu4nhGBEQZu FpqJNmZFsbNef+3Zl2wdMxZ/ deycnH+GJqhKhjRRoFqoyvkS2RyQBohstkk171LSGlhDruw==~1 |
| _cs_id | 8a9da34f-cd03-ae58- d965-895f6f992475.1719603757.1.1719604025.1719603757.1.1 753767757716.1 |
| _cs_s | 7.0.0.1719605825483 |
| _mkto_trk | id:156-OFN-742&token:_mch-nvidia.com-1719603757778-66299 |
| _biz_nA | 10 |
| _biz_pendingA | %5B%5D |
| tp | 3740 |
| s_ppv | nv%253Asearch%2C25%2C25%2C953 |
| s_sq | %5B%5BB%5D%5D |
| mbox | session#367b391332cf45e19c441e6cd60146ba#1719605988| PC#367b391332cf45e19c441e6cd60146ba.35_0#1782848928 |

96.     Further, both Adobe domains receive the user's IP address and user-agent information, along with each request.

### 6.     LiveRamp Cookies

97.     Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users click or select the "Decline All" button and/or toggle off "Performance Cookies" and "Advertising Cookies," to and from the **rlcdn.com** domain.[30] This domain is associated with LiveRamp, a software company that allows businesses to combine customer data from various online and offline sources and leverage that data for

---

[30] *See* https://docs.liveramp.com/identity/en/implementing-liveramp-s-cookie-sync-tag.html and https://docs.liveramp.com/connect/en/announcing-required-pixel-changes--7-2-19-.html.

CLASS ACTION COMPLAINT

marketing and analytics purposes.[31] These cookies are used to create an online identification

code for the purpose of recognizing users' devices and tracking their user behavior.

98.    Defendant identified these cookies as "Advertising Cookies" in the Website

Cookie Policy and described its purposes as follows:

| rlas3 | Persistent cookie (expires after 1 year) | Third Party (rlcdn.com) | This cookie is used to deliver advertising more relevant to you and your interests. It is also used to limit the number of times you see an advertisement as well as help measure the effectiveness of the advertising campaign. |
|---|---|---|---|

99.    These cookies enable LiveRamp to obtain and store at least the following user

data: browsing history, visit history, website interactions, user input data (such as email address),

demographic information, interests and preferences, device information, user identifiers, and

geolocation data (including IP addresses), on the Websites. The unique user identifier enables

LiveRamp to sell a user's unique data for use in online and cross-channel advertising (including

targeted advertising and email marketing).

100.    LiveRamp explains in its Privacy Notice the user data it receives from cookies

installed on "partner websites" and how it uses (and monetizes) that data as follows:

> [The website] partner may sell or share personal information collected from you, such as
> your email, cookies set on your browser, IP address, or information about your browser
> or operating system, with LiveRamp. LiveRamp uses this information to create an online
> identification code for the purpose of recognizing your device. This code may be placed
> in our partners' cookie and for use in online and cross-channel advertising (including
> targeted advertising and email marketing), or LiveRamp may connect it to LiveRamp's
> own 3rd-party cookie and other identifiers. In addition, by associating an email address
> with a cookie, LiveRamp and third parties can link your browsing activity across
> different websites and other applications and services to your specific device associated
> with the email address, identifying the user behind the device. This means that, even
> when browsing unrelated sites, your online activity can be connected to you for
> advertising and other marketing-related purposes, including email marketing and offline
> advertising...
>
> The personal data and identifiers we collect (for instance, a cookie ID) may be linked to
> other personal data and identifiers through known associations and/or identity resolution
> (for instance, an identifier derived from or associated with a hashed email address and
> LiveRamp cookie 1234 might be associated with partner cookie 5678), and shared with
> advertising partners and other third party advertising companies for the purpose of

---

[31] See https://liveramp.com/privacy/service-privacy-policy/#section1a; *see also* LiveRamp Data
Marketplace (available at https://liveramp.com/data-marketplace/).

CLASS ACTION COMPLAINT

enabling interest-based content or targeted advertising throughout your online and offline experiences (e.g., web, TV [MVPDs], connected TV, mobile applications, email marketing and other media). These third parties may in turn use this identifier to link demographic or interest-based information you have provided in your interactions with them. Note that LiveRamp does not itself provide the service of targeted advertising (sometimes referred to as "cross-context advertising") but, rather, processes and transfers data to an advertiser's advertising platform so that platform can provide targeted advertising services...[32]

### 7.    Taboola Cookies

101.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users click or select the "Decline All" button and/or toggle off "Performance Cookies" and "Advertising Cookies," to and from the **taboola.com** domain.[33] This domain is associated with Taboola, Inc., "one of the world's leading performance advertising platforms for the open web. Through our exclusive partnerships with many of the world's top websites, we help advertisers engage with over 600 million unique daily active users."[34] "Taboola's platform is powered by Deep Learning technology that uses Taboola's unique data about people's interests and information consumption to recommend the right content to the right person at the right time."[35] Taboola's technology learns user engagement patterns by analyzing data it collects using cookies about user "reading preferences, browsing history, device, location, time of day and more..."[36]

102.    Taboola cookies enable it to obtain and store at least the following user data: user identifiers, browsing history, visit history, website interactions, user input data (such as email addresses), demographic information (such as gender and age), interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers (i.e., "cookie IDs"), and/or geolocation data.[37] This data allows Defendant to target its

---

[32] Id.

[33] *See* LiveRamp Product and Service Privacy Notice (available at https://liveramp.com/privacy/service-privacy-policy/).

[34] *See* https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works#.

[35] Id.

[36] Id.

[37] Taboola Privacy Policy (available at https://www.taboola.com/policies/privacy-policy#information-we-collect-from-users-user-information); *see also* Taboola Cookie Policy (available at https://www.taboola.com/policies/cookie-policy).

advertising campaigns to users based on user "location, time, browser type, connection type, audience segments, and more."[38]

103.    For example, the Taboola software code that Defendant causes to be stored on and executed by the Websites user's device causes the following cookie data to be sent to Taboola's domain, at sync.taboola.com:



104.    According to Taboola documentation, the "t_gid" cookie "[a]ssigns a unique, User ID that Taboola uses for attribution and reporting purposes, and to tailor recommendations to this specific user based on interactions with an advertiser or publisher."[39] The cookie stays on the consumer's device and does not expire for an entire year.[40]

105.    Taboola explains in its Privacy Policy the user data it receives from cookies installed on its customers' (such as Defendant) websites  and how it uses (and monetizes) that data to create audience segments as follows:

> We use User Information for the following purposes: … **Offering our Customers data segments that help target content and advertisements for topics, products, and services that may interest you.** A data segment is a grouping of users who share one or more attributes (e.g., travel enthusiasts). We offer a number of data segments, both proprietary and from our data partners, to our Customers so that they may better target Users who are more likely to be interested in their content and advertisements. Taboola does not knowingly create segments that are based upon what we consider to be sensitive information (for example, Personal Data revealing your  racial  or  ethnic  origin  or  your  religious

---

[38] *See* https://help.taboola.com/hc/en-us/articles/115006597307-How-Taboola-Works#; *see also* https://help.taboola.com/hc/en-us/articles/115001936293-Targeting-Marketplace-Audiences#.

[39] https://www.taboola.com/policies/cookie-policy.

[40] *Id.*

CLASS ACTION COMPLAINT

affiliations, or Personal Data concerning your sensitive health information, sex life or sexual orientation, or genetic or biometric data). In connection with our Services, our Customers may use these standard health-related segments about non-sensitive conditions such as an inferred interest in health and wellness or over the counter medications. In addition, Taboola offers our Customers standard political-related segments that may indicate general political sentiment, interest in specific political issues, and political party affiliation.[41]

### 8.    Salesforce Cookies

106.    Defendant also causes data and cookies to be transmitted to and from Website users' browsers and devices, even after users elect to disable all cookies (including "Advertising" cookies), to and from the **evergage.com** domain, which points to Salesforce's Interaction Studio product. Salesforce describes that product as follows:

> Interaction Studio enhances the power of Marketing Cloud with expanded real-time personalization. Companies use Interaction Studio to tailor interactions with customers and prospects to increase loyalty, engagement, and conversions. Using real-time cross-channel personalization and machine learning capabilities, Interaction Studio complements Marketing Cloud's robust customer data, audience segmentation, and engagement platform.[42]

107.    For instance, Defendant has configured the Nvidia Website to send the following query string and cookie data to be sent to nvidiacorp.us-5.evergage.com, which is hosted by Salesforce:

---

[41] Taboola Privacy Policy (available at https://www.taboola.com/policies/privacy-policy#information-we-collect-from-users-user-information) (emphasis in original).

[42] https://help.salesforce.com/s/articleView?id=sf.mc_isev_interaction_studio.htm&type=5.

CLASS ACTION COMPLAINT



108.    This data informs Salesforce of the exact product that the user was viewing on the Website. The data also includes an ".anonId," which is an identifier used to uniquely track the user throughout all interactions with the Website.

109.    In addition, Defendant causes the user's user-agent and  IP address information to be sent to Salesforce.

### 9.    Additional Third Party Cookies

110.    Defendant also causes third party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to "Decline All" cookies, including all Performance and Advertising cookies to and from other domains, including pubmatic.com; ib.adnxs.com; px.ads.linkedin.com; analytics.twitter.com; ps.eyeota.net; analytics.yahoo.com;

**CLASS ACTION COMPLAINT**

adroll.com; rubiconproject.com; casalemedia.com; bidswitch.net; 3lift.com; outbrain.com; and openx.net.

111.    The **pubmatic.com** domain (and its subdomains) is associated with PubMatic, Inc., a digital advertising company.[43] PubMatic uses pubmatic.com cookies to collect data on user behavior on websites including user interactions with advertising content.[44] PubMatic uses this data to personalize advertising content and track users across the internet.[45] Defendant identified pubmatic cookies as "Advertising Cookies" in the Website's Cookie Policy and described their purpose as follows:

| KRTBCOOKIE_xxxx | Persistent cookie (expires after 90 days) | Third Party (pubmatic.com) | This cookie is used to correlate IDs with those of Pubmatic partners (such as demand side platform clients or other advertising technology companies). Pubmatic passes information stored by the partner in this cookie to the partner when it is considering whether to purchase advertisements. This enables the partner to make better decisions about whether to display an advertisement to you. |
| --- | --- | --- | --- |

112.    The **adnxs.com** domain is associated with AppNexus, owned by Microsoft. Microsoft uses adnxs.com cookies to collect data on user navigation and behavior on websites, including information on user preferences and/or interaction with web-campaign content, to target advertisements.[46] The cookies include unique identifiers that help Microsoft recognize users across different websites and sessions.[47] This allows cookies set from the adnxs.com domain to collect data, including IP address, user demographic information, geographic location, page views, and interactions with websites.[48] These cookies also enable Household Attribution, a feature that enables Microsoft to match ads served on any device to website

---

[43] *See* www.metrixlab.com.

[44] *See*, PubMatic, Inc. Form 10-K for year ending December 31, 2023 (Filed February 28, 2024) at 17–18.

[45] *Id*.

[46] https://cookiepedia.co.uk/host/adnxs.com.

[47] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json.

[48] *Id*.; https://www.microsoft.com/en-us/privacy/privacystatement#mainpersonaldatawecollectmodule.

CLASS ACTION COMPLAINT

activity occurring on any device connected to the same network using the same IP address.[49] Further, the cookies enable advertisers to track the effectiveness of campaigns and avoid showing the same ads repeatedly to the same users. Microsoft uses this data to personalize ad content and track users across the internet. Adnxs.com cookies also categorize users into different segments based on their interests, demographics, or behaviors. This segmentation is used to target specific audiences with tailored ads. The data collected by cookies set through the adnxs.com domain has allowed Microsoft to set up a platform in which advertisers can bid for and place advertisements targeted at users based on a variety of demographics, including, among other things, demography, device type, and location.[50]

113.    The **linkedin.com** domain is owned by LinkedIn Corporation—a subsidiary of Microsoft Corp. LinkedIn Corporation runs the social media-based business networking platform LinkedIn. Cookies set by the linkedin.com domain are used to target website users with advertising.[51] Defendant identified LinkedIn cookies as "Advertising Cookies" in the Website Cookie Policy and described its usage as follows:

> This domain is owned by LinkedIn, the business networking platform. It typically acts as a third party host where website owners have placed one of its content sharing buttons in their pages, although its content and services can be embedded in other ways. Although such buttons add functionality to the website they are on, cookies are set regardless of whether or not the visitor has an active LinkedIn profile, or agreed to their terms and conditions. For this reason it is classified as a primarily tracking/targeting domain.

---

[49] https://learn.microsoft.com/pdf?url=https%3A%2F%2Flearn.microsoft.com%2Fen-us%2Fxandr%2Fmonetize%2Ftoc.json.

[50] https://learn.microsoft.com/en-us/xandr/monetize/buy-side-targeting#other-targeting-guidance.

[51] https://cookiepedia.co.uk/host/linkedin.com.

**CLASS ACTION COMPLAINT**

114.    Linkedin explains its cookies are used to target users with advertising and measure the performance of such ads.[52] These cookies assign a unique ID to users' devices, which allows LinkedIn to track users across the internet, and to collect information regarding IP address, operating system, browser information, web browsing activity—including the URL of both the site the users came from before accessing the website with the linkedin.com cookies and the one to which users navigate when they leave the website with the linkedIn.com cookies—download and purchase activity, and how users interact with ads.[53]  Cookies set by the linkedIn.com domain are used to target users with advertisements on and off the LinkedIn social media platform.[54].

115.    The **twitter.com** domain is associated with X Corp, formerly known as Twitter. X Corp's cookies collect a wide range of user data, including a user's browsing history; IP address; interactions with advertisements; data used to authenticate and secure personal accounts; and reading a device's local storage.[55] Defendant identified Twitter cookies as "Advertising Cookies" in the Website Cookie Policy that are "primarily used for tracking and targeting."   X Corp uses the collected user data to target users with personalized advertisements and content, generate analytics on website interaction, and to conduct unspecified "Research and Development."[56]

116.    The **ps.eyeota.net** domain is associated with Eyeota, a subsidiary of Dun & Bradstreet, a "Leading Business Data Analytics" firm.[57] Eyeota's cookies collect data associated with a user's browser history, as well as anything a visitor interacts with on a particular website page. Eyeota uses the collected data to target users with personalized advertisements, as well as collate data to sell to other businesses to help companies drive

---

[52] https://www.linkedin.com/legal/cookie-policy.

[53] *Id*.

[54] *Id*.

[55] *See* https://help.x.com/en/rules-and-policies/x-cookies.

[56] *Id*.

[57] Dun & Bradstreet solutions (available at https://www.dnb.com/).

CLASS ACTION COMPLAINT

growth, manage risk, and strengthen the performance of their business. Defendant identified Eyeota cookies as "Advertising Cookies" in its Website Cookie Policy and described them as "This domain is owned by Eyeota, a global company specialising in audience data to enable targeting of advertising based on visitor profiling."

117.    The **yahoo.com** domain is owned by Yahoo Inc., a technology company that focuses on online media and advertising. Cookies set by the yahoo.com domain are used to target website users with advertising by assigning Website users unique identifiers.[58] These cookies collect information, such as IP addresses, browser type and settings, operating system, device type, and advertising identifiers from other third parties, including Apple's ID for Advertising, Apple's ID for vendors, Google's Android ID, and Google's Play Store Ad ID.[59] Cookies are further used to support Yahoo's targeting of content and advertising and to associate users, devices, and accounts with each other or with those in a similar location, such as in the same household.[60] Yahoo's use of a unique identifier with its cookies allows it to track users across the internet and across different devices.[61] The purpose of Yahoo Inc.'s cookies and the data they collect is to track users and target them with advertisements—the sale of which Yahoo uses to generate revenues. Defendant identified Yahoo cookies as "Advertising Cookies" in its Website Cookie Policy and described its main business activity as "Search / Advertising."

118.    The **adroll.com** domain is associated with AdRoll, a digital advertising platform owned by NextRoll, Inc.[62] AdRoll uses cookies to perform retargeting, a practice that involves tracking users who have previously visited a client's website and serving them

---

[58] https://cookiepedia.co.uk/host/yahoo.com

[59] https://legal.yahoo.com/us/en/yahoo/privacy/topics/
cookies/index.html#:~:text=When%20you%20log%20in%20to,or%20device%20you%20are%2
0using.

[60] *Id.*

[61] *Id.*

[62] *See* AdRoll Cookies and Opt-Out Options, accessed September 26, 2025,
https://help.adroll.com/hc/en-us/articles/21402369325069-AdRoll-Cookies-and-Opt-Out-Options

personalized advertisements on other websites across the internet.[63] These cookies collect data on user browsing activity, website interactions, and cross-device behavior to build user profiles for interest-based advertising campaigns.[64] AdRoll's technology, through cookies such as_adroll and _adroll_shared, assigns unique identifiers to users to facilitate this tracking and ad delivery across multiple platforms and devices, enabling a persistent view of a user's activity regardless of whether they are on a desktop or mobile device.[65]

119.    The **rubiconproject.com** domain is associated with the Rubicon Project, an advertising exchange platform owned by Magnite, Inc.[66] Rubicon Project operates as a Supply-Side Platform (SSP), enabling website publishers to sell their advertising inventory through real-time bidding auctions. Its cookies are used to assign unique identifiers to users, collect data on their browsing behavior (including IP address, location, and websites visited), and facilitate the exchange of this user data with various ad services.[67] This process, known as cookie syncing, allows advertisers to identify and bid on ad impressions to target specific users across the web, forming a foundational component of the programmatic advertising ecosystem.[68]

120.    The **casalemedia.com** domain is associated with Casale Media, a digital advertising technology company that operates as part of an ad exchange network.[69] Casale Media's cookies are used to collect data about users' website visits and online behavior, including the number of visits, time spent on sites, and pages loaded.[70] This information is used

---

[63] *See* Adroll - What Are Cookies? accessed September 26, 2025, https://www.adroll.com/third-party-cookies/what-are-cookies.

[64] *See* AdRoll Cookies and Opt-Out Options, accessed September 26, 2025, https://help.adroll.com/hc/en-us/articles/21402369325069-AdRoll-Cookies-and-Opt-Out-Options.

[65] *See id*.

[66] *See* Platform Cookie Policy - Magnite, accessed September 26, 2025, https://www.magnite.com/legal/platform-cookie-policy/.

[67] *See id*.; *See also* User Choice Portal | Manage Your Privacy Preferences with Magnite, accessed September 26, 2025, https://www.magnite.com/legal/user-choice-portal/.

[68] *See id*.

[69] *See* https://www.indexexchange.com/about/.

[70] *See* https://www.indexexchange.com/privacy/exchange-platform-privacy-policy/.

CLASS ACTION COMPLAINT

to build user profiles for the purpose of delivering targeted advertising.[71] The platform enables advertisers to segment audiences and optimize ad relevance by tracking users across multiple websites within its network, and its cookies can also be used for functions like frequency capping to limit the number of times a user is shown the same advertisement.[72]

121.    The **bidswitch.net** domain is associated with BidSwitch, Inc., a technology platform that functions as middleware in the programmatic advertising ecosystem. [73] BidSwitch's cookies are not used to directly serve ads to users, but rather to facilitate the service of ads between Supply-Side Platforms (SSPs) and Demand-Side Platforms (DSPs).[74] The cookies store unique user IDs and regulate the synchronization of these IDs across different advertising services.[75] This "cookie syncing" is essential for enabling advertisers on various platforms to recognize a user and participate in real-time bidding auctions for ad space on publisher websites, effectively acting as a central hub for identity matching in the ad-tech industry.[76]

122.    Defendant identified bidswitch cookies as "Advertising Cookies" in its Website Cookie Policy and described their purpose as follows:

| tuuid_lu | Persistent cookie (expires after 365 days) | Third Party (bidswitch.net) | This domain is owned by IPONWEB and is used to provide a real time bidding platform for online advertising. |
|---|---|---|---|

123.    The **3lift.com** domain is associated with TripleLift, Inc., an advertising technology platform that specializes in programmatic advertising.[77] TripleLift's cookies are used to assign a unique digital identifier (stored in the "TLUID" cookie) to a user's browser or device.[78] This identifier enables the tracking of users across different websites to collect data

---

[71] *Id.*

[72] *Id.*

[73] *See* https://www.bidswitch.com/

[74] *See* https://www.bidswitch.com/privacy-policy/.

[75] *Id.*

[76] https://clearcode.cc/blog/what-is-bidswitch/.

[77] *See* https://triplelift.com/.

[78] *See* https://triplelift.com/user-rights-policy-and-opt-out/.

CLASS ACTION COMPLAINT

for targeted advertising, including interest-based targeting and ad performance measurement.[79] The company also leverages first-party publisher data to create audience segments, positioning this as an addition to traditional third-party cookie tracking in response to industry privacy changes.[80]

124.    The **<u>outbrain.com</u>** domain is associated with Outbrain's advertising services. Outbrain, currently owned and operated by Teads Holding Co., uses cookies to assign a unique user ID to a user's device to track their content consumption across a network of partner publisher websites.[81] This data, including browsing history and content engagement, is used to build user profiles and interest segments. [82] These profiles enable Outbrain to serve personalized content and product advertisements, a practice it refers to as "recommendations," to users on its partner sites. Outbrain's promoted content is found on over 100,000 websites, and, in 2020, it provided an average of 10 billion content recommendations or deliveries daily for over 20,000 advertisers. [83] Further, the cookies perform analytics functions to enable Outbrain to measure and analyze the performance of its services and to ensure that ads are effective and relevant. Outbrain uses machine learning and artificial intelligence to advertise products to consumers that users are likely to find relevant and engaging.[84]

125.    The **<u>openx.net</u>** domain is associated with OpenX, a digital advertising technology company that operates a programmatic ad exchange. [85] Defendant identified openx.net cookies as "Advertising Cookies" in its Cookie Policy. OpenX uses cookies to facilitate the buying and selling of digital advertising. These cookies assign unique online identifiers to users, which are used to collect data across different websites about their online

---

[79] *See* https://triplelift.com/platform-privacy-policy/.

[80] *See* https://triplelift.com/resources/case-study/triplelift-audiences-exceed-benchmarks/

[81] *See* Privacy FAQ - Outbrain, accessed September 26, 2025, https://www.outbrain.com/privacy/privacy-faq/.

[82] *See* Outbrain DSP Cookie Table, accessed September 26, 2025, https://www.outbrain.com/privacy/outbrain-dsp-cookie-table/.

[83] *See id.*

[84] *Id.*

[85] *See* https://www.openx.com/publishers/ad-exchange/.

CLASS ACTION COMPLAINT

activity, browsing history, and inferred interests.[86] This information enables interest-based advertising, allowing advertisers to target specific users with relevant ads. The platform also uses cookies for ad delivery management, such as controlling ad frequency, measuring campaign performance, and syncing user identifiers with other advertising partners.[87]

126.    These cookies allow these Third Parties to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, (v) interests and preferences, (vi) shopping behaviors, (vii) device information, (viii) referring URLs, (ix) session information, (x) user identifiers, and/or (xi) geolocation data—including whether a user is located in California.

**D.    The Private Communications Collected are Valuable.**

127.    As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiff's and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiff and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

128.    The Private Communications that the Third Parties track and collect by way of the cookies on the Website are valuable to Defendant as well as the Third Parties. Defendant can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendant wanted to market certain of its software or hardware products to consumers in California, Defendant could use the data collected by the Third Parties to monitor the location of users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies also

---

[86] *See* https://www.openx.com/privacy-center/ad-exchange-privacy-policy/.

[87] *See id.*

enable Defendant to target online advertisements to users when they visit *other* websites, even those completely unrelated to Defendant and its products.

129.    Data about users' browsing history enables Defendant to spot patterns in users' behavior on the Website and their interests in, among other things, Defendant's computer graphics card products. On a broader scale, it enables Defendant to gain an understanding of trends happening across its brands and across the computer graphics card market. All of this helps Defendant further monetize its Website and maximize revenue by collecting and analyzing user data.

130.    The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[88] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

131.    Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

132.    Through its false representations and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Website using third-party cookies, Defendant is unjustly enriching itself at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how they would monetize their data.

## PLAINTIFF'S EXPERIENCES

133.    Plaintiff visited the Website to seek and obtain information about NVIDIA's products, while located in California, on multiple occasions during the last four years.

---

[88] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

CLASS ACTION COMPLAINT

134.    Plaintiff's visits to the Website were consistent with a typical Website user's visits seeking information about Defendant's products. Specifically, Plaintiff is not a consumer advocate, a "tester," or a compliance auditor that visited the Website to test or evaluate Defendant's privacy practices.

135.    Specifically, Plaintiff searched for company news by typing "news" into the Website search bar. He clicked on some of the Website's "Corporate Blog" posts. Plaintiff also browsed through some of the AI-related products available for sale on the Website, including graphics cards and products related to AI robotics.

136.    When Plaintiff visited the Website, the Website immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "Manage Cookies" button. Plaintiff viewed Defendant's representation on the popup cookie consent banner that, "NVIDIA uses cookies to enable and improve the use of the website. Please see our Cookie Policy for more information. You can manage your cookie settings by clicking 'Manage Cookies' or going to the NVIDIA Privacy Center." Accordingly, Plaintiff saw that, rather than choosing to accept such cookies by clicking or selecting the "I Understand" button, users apparently could instead choose to "Manage Cookies" by clicking or selecting the button to do so.

137.    Consistent with his typical practice in managing or otherwise declining the placement or use of cookies and tracking technologies, Plaintiff selected and clicked the "Manage Cookies" button. In doing so, Plaintiff was then presented with Defendant's Cookie Settings window. There, Defendant further represented that, "NVIDIA websites use cookies to deliver and improve the visitor experience." Defendant, through the Cookie Settings window, represented that the Website used "Performance Cookies[,]" which "[c]ount[] website visits and clicks to understand where people most engage with links[,]" and "Advertising Cookies[,]" which are "[s]et by our advertising partners" and are "used to build a profile of your interests and show you relevant ads on other sites." The window also represented that the Website used "Required Cookies" that are "required for the site to function" and "cannot be turned off."

CLASS ACTION COMPLAINT

Defendant further represented that users, including Plaintiff, could adjust settings or toggles to turn "off" each category of Performance and Advertising cookies, or click or select the "Decline All" button to decline all such cookies, except those "Required" for the Website to function.

138.    Accordingly, Plaintiff selected and clicked the "Decline All" button, which caused both the popup cookie consent banner and Cookie Settings window to disappear, allowing Plaintiff to browse the Website, which he then proceeded to do. Plaintiff believed that selecting the "Decline All" button on the Cookie Settings window found on the Website would allow him to opt out of, decline, and/or reject "All" cookies and other tracking technologies, except those "Required" for the Website to function (but inclusive of those Performance and Advertising cookies that cause the disclosure of tracking data to third-party performance analytics services and advertising networks and for the purposes of providing performance analytics and advertising services).

139.    In selecting the "Decline All" button, Plaintiff gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff specifically declined, based on Defendant's representations, those cookies used to "used to build a profile of your interests and show you relevant ads on other sites[,]" "[c]ount[] website visits and clicks to understand where people most engage with links[,]" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff continue browsing the Website.

140.    Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for advertising and performance analytics, to be placed on Plaintiff's device and/or transmitted to the Third Parties along with user data, without Plaintiff's knowledge. Accordingly, the popup cookie consent banner's and Cookie Settings window's representations to Plaintiff that he could decline the use and/or placement of "All" cookies and tracking technologies while he browsed the Website were false. Contrary to what Defendant made Plaintiff believe, he did not

CLASS ACTION COMPLAINT

have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant had already caused that to happen.

141. Then, as Plaintiff continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and Cookie Settings window, and despite Plaintiff's clear declination of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing advertising and performance analytics from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff browsed the Website.

142. Defendant's representations that consumers could "Decline All" cookies while Plaintiff and users browsed the Website, or at least those involved in providing advertising and performance analytics, were untrue. Had Plaintiff known this fact, he would not have used the Website. Moreover, Plaintiff reviewed the popup cookie consent banner and Cookie Settings window prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline "All" such cookies, Plaintiff would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

143. Plaintiff continues to desire to browse content featured on the Website. Plaintiff would like to browse websites that do not misrepresent that users can "Decline All" cookies and tracking technologies. If the Website were programmed to honor users' requests to decline "All" cookies and tracking technologies, Plaintiff would likely browse the Website again in the future, but will not do so until then. Plaintiff regularly visits websites that feature content similar to that of the Website. Because Plaintiff does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to "Decline All"

cookies and tracking technologies, Plaintiff will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff is not a software developer and has not received training with respect to HTTP network calls.

## **CLASS ALLEGATIONS**

144.    Plaintiff brings this Class Action Complaint on behalf of himself and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed the Website after clicking or selecting the "Decline All" button in the Cookie Settings window and/or after toggling off "Performance Cookies" and "Advertising Cookies" in the Cookie Settings window.

145.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

146.    **Numerosity:** Plaintiff does not know the exact size of the Class, but he estimates that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

147.    **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be

placed on their browsers and devices and/or transmitted to third parties along with user data, after Class members chose to "Decline All" cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class members' Private Communications as Class members browsed the Website.

148. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiff and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

149. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, Plaintiff, like the other Class members, visited the Website, declined "All" cookies, and had his confidential Private Communications intercepted by the Third Parties.

150. **Adequacy of Representation:** Plaintiff will fairly and adequately protect the interests of all Class members because it is in his best interests to prosecute the claims alleged herein to obtain full compensation due to him for the unfair and illegal conduct of which he complains. Plaintiff also has no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiff has retained highly competent and experienced class action attorneys to represent his interests and those of the Class. By prevailing on his claims, Plaintiff will establish Defendant's liability to all Class members. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

CLASS ACTION COMPLAINT

151.    **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy

152.    Plaintiff realleges and incorporates the paragraphs of this Complaint as if set forth herein.

153.    To plead an invasion of privacy claim, Plaintiff must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiff had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

154.    Defendant has intruded upon the following legally protected privacy interests of Plaintiff and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiff's and Class members' Fourth Amendment right to privacy.

155.    Plaintiff and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "Decline All" cookies and tracking technologies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function, before proceeding to browse the Website. Plaintiff and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner and Cookie Settings window on the Website, Plaintiff and Class members declined "All" cookies and reasonably expected that his and their declination of "All" cookies and tracking technologies would be honored. That is, he and they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiff and Class members also reasonably expected that, if they declined "All" such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiff's and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

156.    Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

157.    Defendant, in violation of Plaintiff's and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed third parties to collect

CLASS ACTION COMPLAINT

enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiff's and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

158.    Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

159.    Defendant's intrusion into Plaintiff's privacy was also highly offensive to a reasonable person.

160.    Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

161.    Plaintiff and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

162.    Plaintiff and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as

CLASS ACTION COMPLAINT

well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's and Class members' privacy.

163.    Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' declination of the Website's use of "All" cookies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### Second Cause of Action: Intrusion Upon Seclusion

164.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

165.    To assert a claim for intrusion upon seclusion, Plaintiff must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiff had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

166.    By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiff's and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner and Cookie Settings window, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

167.    The Third Parties' tracking and collecting of Plaintiff's and Class member's Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be transmitted to Third Parties—was not authorized by

Plaintiff and Class members, and, in fact, those Website users specifically chose to "Decline All" cookies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function.

168.    Plaintiff and the Class members had an objectively reasonable expectation of privacy surrounding his and their Private Communications on the Website based on Defendant's promise that users could "Decline All" cookies, as well as state criminal and civil laws designed to protect individual privacy.

169.    Defendant's intentional intrusion into Plaintiff's and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could "Decline All" cookies when, in fact, Defendant caused such third-party cookies to be stored on consumers' devices and browsers, and to be transmitted to third parties, even when consumers declined all such cookies. Indeed, Plaintiff and Class members reasonably expected, based on Defendant's false representations, that when he and they declined "All" cookies and tracking technologies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function, Defendant would not cause such third-party cookies to be stored on his and their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

170.    Defendant's conduct was intentional and intruded on Plaintiff's and users' Private Communications on the Website.

171.    Plaintiff and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

172.    Plaintiff and Class members seeks appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as

CLASS ACTION COMPLAINT

well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiff's and Class members' privacy.

173.    Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' declination of the Website's use of "All" cookies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

### Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)

174.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

175.    California Penal Code § 631(a) provides, in pertinent part:

> "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

176.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

177.    Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous*

CLASS ACTION COMPLAINT

*dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis supplied; internal citations omitted).

178.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under § 631(a), Plaintiff need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

[i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;

[ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;

[iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

179.    CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

180.    Defendant is a "person" within the meaning of California Penal Code § 631.

181.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

182.    The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

183.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiff and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

184.    Under § 631(a), Defendant must show it had the consent of all parties to a communication.

185.    At all relevant times, the Website caused Plaintiff and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiff's and Class members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiff and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

186.    At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of

electronic communications of Plaintiff and Class members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

187.    The Private Communications of Plaintiff and Class members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicates the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

188.    At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

189.    Plaintiff and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class members' electronic communications. Nor did Plaintiff and Class members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiff and Class members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic communications by choosing to "Decline All" cookies in the Cookie Settings window.

190.    The wiretapping of Plaintiff and Class members occurred in California, where Plaintiff and Class members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiff's and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties,

CLASS ACTION COMPLAINT

resided on Plaintiff's California-located device. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

191.    Plaintiff and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of his and their right to privacy, (ii) loss of value in his and their Private Communications, (iii) damage to and loss of Plaintiff's and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

192.    Pursuant to California Penal Code § 637.2, Plaintiff and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

193.    Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant.  Plaintiff, Class members, and the general public continue to be at risk because Plaintiff, Class members, and the general public frequently use the internet to search for information and content related to computer hardware and software products, such as the computer graphics cards Defendant manufactures and sells. Plaintiff, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiff, Class members, and the general public have no practical way to know if his and their request to "Decline All" cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class

CLASS ACTION COMPLAINT

members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

194.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

195.    The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

196.    California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

197.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

198.    The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiff's and the Class's computers or devices. Cal. Penal Code § 638.50(b).

199.    At all relevant times, Defendant caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiff's and Class members' browsers and devices, and/or to be used to transmit Plaintiff's and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15-16

**CLASS ACTION COMPLAINT**

(S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5-11 (N.D. Cal. Oct. 21, 2024).

200.    Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiff's and the Class members' electronic communications with the Website. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014). ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

201.    Plaintiff and Class members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiff and the Class members informed Defendant that they did not consent to the Website's use of third-party cookies by clicking or selecting the "Decline All" button in the Cookie Settings window and/or by toggling off "Performance Cookies" and "Advertising Cookies" in the Cookie Settings window.

202.    Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiff's and Class member's IP addresses and user-agent information.

203.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members suffered losses and were damaged in an amount to be determined at trial.

204.    Pursuant to Penal Code § 637.2(a)(1), Plaintiff and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

205.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

206.    Defendant fraudulently and deceptively informed Plaintiff and Class members that he and they could "Decline All" cookies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function.

207.    However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be transmitted to the Third Parties alongside Private Communications, even after users clicked or selected the "Decline All" button in the Cookie Settings window and/or by toggled off "Performance Cookies" and "Advertising Cookies" in the Cookie Settings window. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiff's and Class members' Private Communications, even when consumers had previously chosen to decline all cookies.

208.    These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiff and Class members, and material at the time they were made. Defendant knew, or should have known, how the Website functioned, including the Third Party's resources it installed on the Website and the third-party cookies in use on the Website, through testing the Website, evaluating its performance metrics by means of its accounts with the Third Parties, or otherwise, and knew, or should have known, that the Website's programming allowed the third-party cookies to be placed on users'—including Plaintiff's—browsers and devices and/or transmitted to the Third Parties along with users' Private Communications even after users attempted to "Decline All" cookies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function, which Defendant promised its users they could do. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff and Class members as to whether to use the Website. In misleading Plaintiff and Class members and not so informing him and them, Defendant breached its duty to Plaintiff and Class members. Defendant also gained financially from, and as a result of, its breach.

209.    Plaintiff and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

210.    Plaintiff and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful

practices, including the unauthorized interception of his and their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiff and Class members have also suffered harm in the form of diminution of the value of his and their private and personally identifiable information and communications.

211. Defendant's actions caused damage to and loss of Plaintiff's and Class members' property right to control the dissemination and use of their personal information and communications.

212. Defendant's representation that consumers could "Decline All" cookies (including those Advertising cookies "used to build a profile of your interests and show you relevant ads on other sites" and those Performance cookies used to "[c]ount[] website visits and clicks to understand where people most engage with links") if they clicked or selected the "Decline All" cookies button and/or by toggled off "Performance Cookies" and "Advertising Cookies" in the Cookie Settings window was untrue. Again, had Plaintiff and Class members known these facts, they would not have used the Website. Moreover, Plaintiff and Class members reviewed the popup cookie consent banner and Cookie Settings window prior to their interactions with the Website. Had Defendant disclosed that it caused third-party non-"Required" cookies to be stored on Website visitors' devices that relate to advertising and performance analytics, and/or share information with third parties, even after they choose to decline all such cookies, Plaintiff and Class members would have noticed it and would not have interacted with the Website.

213. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiff and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiff and Class members to, without limitation, use the Website under the mistaken belief that Defendant

would not permit third parties to obtain users' Private Communications when consumers chose to decline all cookies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function. As a result, Plaintiff and the Class provided more personal data than they would have otherwise.

214. Plaintiff and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

215. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiff and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

216. Plaintiff and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and Class members and made in conscious disregard of Plaintiff's and Class members' rights and Plaintiff's and Class members' declination of the Website's use of all non-required cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Sixth Cause of Action: Unjust Enrichment**

217. Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

218. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

219. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "Decline All" cookies, including all Performance and Advertising cookies, except those cookies "Required" for the Website to function, and by permitting the Third Parties to store and transmit cookies on Plaintiff's and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members declined "All" such cookies.

220.    Plaintiff and Class members' Private Communications have conferred an economic benefit on Defendant.

221.    Defendant has been unjustly enriched at the expense of Plaintiff and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

222.    Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiff and Class members conferred onto Defendant at his and their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiff and Class members.

223.    It would be unjust for Defendant to retain the value of Plaintiff's and Class members' property and any profits earned thereon.

224.    There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

225.    Plaintiff and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiff and Class members to the position he and they occupied prior to having his and their Private Communications tracked and collected by the Third Parties.

226.    Plaintiff pleads this claim separately, as well as in the alternative, to his other claims, as without such claims Plaintiff would have no adequate legal remedy.

## **PRAYER FOR RELIEF**

**WHEREFORE**, reserving all rights, Plaintiff, on behalf of himself and the Class members, respectfully requests judgment against Defendant as follows:

A.    Certification of the proposed Class, including appointment of Plaintiff's counsel as class counsel;

B.    An award of compensatory damages, including statutory damages where available, to Plaintiff and Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C.    An award of punitive damages;

D.    An award of nominal damages;

E.    An order for full restitution;

F.    An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G.    An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H.    For reasonable attorneys' fees and the costs of suit incurred; and

I.    For such further relief as may be just and proper.

Dated: October 24, 2025

GUTRIDE SAFIER LLP

*/s/ Seth A. Safier /s/*
Seth A. Safier (State Bar No. 197427)
    seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
    marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
    todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT