UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STACY PENNING,

        Plaintiff,

    v.

NVIDIA CORPORATION,

        Defendant.

Case No.  25-cv-09160-SVK

**ORDER ON DEFENDANT'S MOTION TO COMPEL ARBITRATION AND MOTION TO DISMISS**

Re: Dkt. Nos. 14, 15

Plaintiff Stacy Penning brings this putative class action on behalf of persons who browsed the website of Defendant NVIDIA Corporation after declining or turning off third-party cookies, alleging that NVIDIA permitted third parties to track and collect class members' private communications despite their cookie settings.  Dkt. 1.  Now before the Court is NVIDIA's motion to compel arbitration of all claims in the Complaint.  Dkt. 14.  All Parties have consented to the jurisdiction of a magistrate judge.  Dkt. 9, 12.  This matter is suitable for determination without oral argument.  Civ. L.R. 7-1(b).  Having carefully considered the Parties' briefs and the applicable legal standards, the Court **GRANTS** NVIDIA's motion to compel arbitration and **STAYS** proceedings in this case pending completion of arbitration.  Because all claims are ordered to arbitration, NVIDIA's motion to dismiss at Dkt. 15 is **DENIED WITHOUT PREJUDICE.**

I.  **BACKGROUND**

    A.  **Allegations in the Complaint**

The following background discussion is taken primarily from the Complaint, which was filed on October 24, 2025.  Dkt. 1.  NVIDIA is a technology company that specializes in designing graphics processing units, AI systems, and software platforms and solutions.  *Id.* ¶ 22.  NVIDIA has a website, www.nvidia.com (the "Website"), where visitors can learn more about NVIDIA's

products. *Id.*

Plaintiff is a California resident who visited the Website "on multiple occasions during the last four years." *Id.* ¶ 133. According to Plaintiff, when consumers visit the Website, it displays a popup cookie consent banner that gives users the option to "Manage Cookies." *Id.* ¶¶ 1, 27. Plaintiff alleges that he declined and/or turned off all cookies, but NVIDIA nevertheless permitted third parties to "to use cookies and other tracking technologies to collect, track, and compile" certain of his interactions with the Website—namely, his "browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data." *See id.* ¶¶ 3, 30-32, 157. On this basis, Plaintiff asserts claims for invasion of privacy (including privacy rights under the Fourth Amendment); intrusion upon seclusion; wiretapping violation under CIPA, Cal. Penal Code § 631; use of a pen register under CIPA, Cal. Penal Code § 638.51; common law fraud, deceit and/or misrepresentation; and unjust enrichment. *Id.* ¶¶ 152-226. Plaintiff brings this action on behalf of a putative class of all persons who browsed the Website after declining cookies. *Id.* ¶ 144.

### B.     Cookie Banners on NVIDIA's Website

The Complaint contains screenshots of a cookie banner that was "immediately displayed" when Plaintiff and other consumers in California visited the Website:

Dkt. 1 ¶¶1, 27. The Complaint alleges that Plaintiff and other Website users who clicked or selected the "Manage Cookies" button were then directed to the following cookie settings window:

////

////

////

////

////

////

United States District Court
Northern District of California

United States District Court
Northern District of California



Dkt. 1 ¶ 28.  Neither the cookie banner nor the cookie settings window depicted in the Complaint refer to NVIDIA's Terms of Service.

NVIDIA has presented evidence that since December 2024, the cookie banner on the Website has been different than the cookie banner depicted in the Complaint.  Dkt. 14-1

United States District Court
Northern District of California

(Declaration of William Lee) ¶¶ 6, 10.  From December 2024 to July 2025, the following cookie banner appeared for Website visitors based in California:



*Id.* ¶ 6.  From July 2025 until present, the following cookie banner appears for Website visitors based in California:

*Id.* ¶ 10.  Both of these cookie banners state that by clicking one of the buttons on the banner, the user accepts NVIDIA's Terms of Service.  *Id.* ¶¶ 6, 10.  In both banners, the phrase "Terms of

4

United States District Court
Northern District of California

Service" is underlined in green, and NVIDIA has presented evidence that the phrase included a hyperlink that, if clicked, would take a visitor to the Terms of Service.  *Id.*

### C.    The Arbitration Clause in NVIDIA's Terms of Service

NVIDIA's motion to compel arbitration is premised on an arbitration agreement in NVIDIA's Terms of Service that, according to evidence provided by NVIDIA, has been in place since February 2024.  Dkt. 14 at 5-6; Dkt. 32 ¶ 5 and Ex. D.[1]  The provisions cited by NVIDIA include the following statement:

> THESE TERMS CONTAIN A MANDATORY INDIVIDUAL ARBITRATION AGREEMENT AND CLASS ACTION/JURY TRIAL WAIVER PROVISION THAT REQUIRE, WITH ONLY SPECIFIED EXCEPTIONS SET FORTH HEREIN OR UNLESS YOU OPT OUT PURSUANT TO THE INSTRUCTIONS HEREIN, THE EXCLUSIVE USE OF FINAL AND BINDING ARBITRATION ON AN INDIVIDUAL BASIS ONLY TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS, COLLECTIVE, PRIVATE ATTORNEY GENERAL OR REPRESENTATIVE ACTIONS OR PROCEEDINGS

Dkt. 32 at Ex. D (PDF p. 48) (all capitals in original).

In a subsection entitled "***Informal Resolution***" within a section entitled **"Governing Law; Dispute Resolution,"** the term "Dispute" is defined to mean "any dispute, claim or controversy arising out of or relating to the Site or these Terms."  *Id.* at PDF p. 53-54 (emphasis in original).

The Terms of Service further provide, in another subsection entitled "***Binding Arbitration***":

> You and NVIDIA agree all Disputes will be resolved by arbitration administered by the office of Judicial Arbitration and Mediation Services ("JAMS") under its Comprehensive Arbitration Rules and Procedures then in effect for JAMS...

---

[1] In its opening brief on the motion to compel arbitration, NVIDIA cited to the Terms of Service that were supposed to be attached as Exhibit A to the Declaration of William Lee filed with the motion.  *See* Dkt. 14 at 5-6.  However, Exhibit A was not attached to the Lee Declaration filed with the Court.  *See* Dkt. 14-1.  After Plaintiff pointed out this omission in his opposition to the motion to compel arbitration (*see* Dkt. 28 at 5), NVIDIA filed a copy of the Terms of Service with its reply brief.  *See* Dkt. 32 ¶ 2 and Ex. D.  In discussions between the Parties, NVIDIA took the position that Plaintiff's counsel already had the Terms of Service from another case but offered to give Plaintiff an "opportunity to review" the Terms of Service and indicated that NVIDIA was open to adjust the briefing schedule. *Id.* ¶¶ 2-3, 5 and Exs. B and D.  Plaintiff's response was somewhat inconclusive but pointed out that Plaintiff had already filed his opposition to the motion to compel arbitration. *Id.* at Ex. D.  Plaintiff did not file an objection to inclusion of the Terms of Service in the reply brief or seek leave to file a surreply, as he could have done under Civil Local Rule 7-3(d).  Under these circumstances, the Court finds that Plaintiff was not prejudiced by NVIDIA's failure to include the Terms of Service with its opening brief.

United States District Court
Northern District of California

*Id.* at PDF p. 54 (emphasis in original).  This arbitration clause states that "[t]he dispute (including whether the claims asserted are arbitrable) will be referred to and finally determined by arbitration in accordance with the JAMS International Arbitration Rules."  *Id.*  The Terms of Service also set forth a procedure by which a user may opt out of the arbitration provision.  *Id.* at PDF p. 55.

## II.     LEGAL STANDARD

The Federal Arbitration Act ("FAA") applies to written contracts "evidencing a transaction involving commerce."  9 U.S.C. § 2; *see also Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 111-12 (2001).  Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  This provision reflects "both a liberal federal policy favoring arbitration [] and the fundamental principle that arbitration is a matter of contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotation marks and citations omitted).

A court must determine two "gateway" issues in assessing whether to compel arbitration: "(1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute."  *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)).  Some arbitration agreements contain a delegation clause.  "A delegation clause is a clause within an arbitration provision that delegates to the arbitrator gateway questions of arbitrability, such as whether the agreement covers a particular controversy or whether the arbitration provision is enforceable at all."  *Caremark, LLC v. Chickasaw Nation,* 43 F.4th 1021, 1029 (9th Cir. 2022).  "The presence of a delegation clause further limits the issues that a court may decide."  *Id.*   "[I]ssues of validity and arbitrability [] can be delegated to an arbitrator by agreement," but "parties cannot delegate issues of formation to the arbitrator."  *Ahlstrom v. DHI Mortg. Co., Ltd., L.P.*, 21 F.4th 631, 634-35 (9th Cir. 2021).

The court must first resolve any challenge alleging that an agreement to arbitrate was never formed.  *Caremark*, 43 F.4th at 1030.  Next, if there is a delegation clause, the Court must resolve any challenge directed specifically to its enforceability.  *Id*.  "Finally, if the parties did form an agreement to arbitrate containing an enforceable delegation clause, all arguments going to the scope or enforceability of the arbitration provision are for the arbitrator to decide in the first

instance." *Id*. at 1021.

District courts use the summary judgment standard when ruling on a motion to compel arbitration. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021). The party seeking to compel arbitration bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence. *Johnson v. Walmart, Inc.*, 57 F.4th 677, 681 (9th Cir. 2023). In evaluating the record, the Court must "give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023) (citations omitted).

If the Court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the [C]ourt shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. But "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." *Id.*

Where the claims alleged in a complaint are subject to arbitration, the Court must stay the action pending arbitration. *Smith v. Spizzirri*, 601 U.S. 472, 478–79 (2024); 9 U.S.C. § 3.

## III.    DISCUSSION

As discussed above, there are two "gateway" issues that the Court must consider in deciding whether to compel arbitration: (1) whether there is an agreement to arbitrate between the parties; and (2) whether the agreement covers the dispute. *Brennan*, 796 F.3d at 1130. Plaintiff did not respond to NVIDIA's argument that Plaintiff's claims against NVIDIA fall within the scope of the purported arbitration agreement between the Parties. *See* Dkt. 14 at 11; *see generally* Dkt. 28.[2] Instead, the Parties' dispute on the present motion centers on whether an agreement to arbitrate exists. *See generally* Dkt. 14 (Motion); Dkt. 28 (Opp.); Dkt. 31 (Reply).

### A.    Choice of Law

The Parties agree that state law governs the question of whether an arbitration agreement was formed. *See* Dkt. 14 at 7 (in answering the question of whether a valid arbitration exists,

---

[2] The arbitration provision in NVIDIA's Terms of Service delegates the issue of whether claims are arbitrable to the arbitrator. *See* Dkt. 32 at Ex. D (PDF p. 54).

United States District Court
Northern District of California

"courts apply state-law principles that govern the formation of contracts"); Dkt. 28 at 3 ("In determining whether a valid arbitration agreement exists, the Court must apply ordinary state-law principles that govern the formation of contracts" (internal quotation marks and citation omitted)). Plaintiff argues that because he is a California citizen who visited Defendant's website while in California, California law governs this question. Dkt. 28 at 3. NVIDIA notes that its Terms of Service specify that Delaware law applies to "[a]ll matters relating to the Site or these Terms and any Disputes" arising under or relating thereto, but acknowledges that Delaware and California law regarding the formation of contracts "are materially the same" and asserts that "the choice-of-law question is of lesser importance here, and cases applying Delaware and California law can both be instructive." Dkt. 14 at 8 n.4 (citation omitted); *see also* Dkt. 32 at PDF p. 41.

The Court finds that California law governs the question of contract formation notwithstanding the Delaware choice of law provision in Defendant's Terms of Service. "Whether the choice of law provision applies depends on whether the parties agreed to be bound by the [Terms of Service] in the first place." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014); *see also Dawson v. Target Corp.*, No. 3:24-cv-08167-AMO, 2025 WL 1651940, at * 1 (N.D. Cal. June 11, 2025). However, the Parties have not identified any difference between California and Delaware law on the question of formation of an arbitration agreement that would be material to resolution of this motion.

### B.     Contract Formation

To form a contract under California law, the parties must manifest their mutual assent to the terms of the agreement by written or spoken word or through a party's intentional conduct from which the party knows or has reason to know that the other party may infer that he assents. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022); *see also Oberstein*, 60 F.4th at 512-13 ("[T]here must be actual or constructive notice of the agreement and the parties must manifest mutual assent"). "These elemental principles of contract formation apply with equal force to contracts formed online," and "[t]hus, if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of the terms, and enforceable agreement can be formed." *Berman*, 30 F.4th at 855-56.

8

### 1.    Contents of Cookie Banner

As a threshold matter, evaluating the questions relevant to contract formation requires the Court to determine which version of the cookie banner Plaintiff saw on the Website.  As shown in section I.B. above, the Complaint includes screenshots of a pop-up cookie consent banner and cookie settings window that do not mention NVIDIA's Terms of Service or include any statement otherwise indicating that Plaintiff would be bound by any arbitration terms by choosing to reject non-essential cookies.  *See* Dkt. 1 ¶¶ 27-28.  Plaintiff argues that in the context of these versions of the Website, NVIDIA's Terms of Service are "unenforceable browsewrap."  Dkt. 28 at 5.

However, NVIDIA's motion to compel arbitration relies not on the cookie banner and cookie settings window depicted in the Complaint but instead on later versions of the cookie banner.  NVIDIA has presented evidence that from December 2024 onward, visitors based in California saw one of two different versions of the cookie banner.  As shown in section I.B. above, both versions of the cookie banner that appeared on the Website during 2025, which this Order will refer to as the "2025 Cookie Banners," contain a hyperlink to the Terms of Service that was underlined in green, include a parenthetical that the Terms of Service "contains important waivers," and state that a user accepts the Terms of Service by clicking one of the buttons on the banner.  Dkt. 14-1 ¶¶ 6, 10.

The Complaint, which was filed on October 24, 2025, states that Plaintiff visited the Website "on multiple occasions during the last four years."  Dkt. 1 ¶ 133.  Neither the Complaint filed with the Court nor Plaintiff's opposition to NVIDIA's motion to compel arbitration identify specific dates upon which Plaintiff visited the Website.  *See* Dkt. 1, 28.

NVIDIA argues that Plaintiff must have visited the Website on or after February 27, 2025 (*i.e.,* at a time when one of the 2025 Cookie Banners was in use) because the screenshots of the Website's search bars in the Complaint, which "purport to be screenshots from the Website during Plaintiff's visits," represent a version of the Website that existed on or after February 27, 2025 and was not available to California-based visitors like Plaintiff until that date.  Dkt. 14-1 ¶ 5; *see also* Dkt. 14 at 2-5.  In support of these arguments, NVIDIA has presented evidence in the form of a declaration from a Senior Director at NVIDIA who is familiar with the content and functionality

of the Website and the Website banners.  Dkt. 14-1.  NVIDIA has also provided evidence that although the Complaint filed with the Court does not identify the date(s) upon which Plaintiff visited the Website, three days before the Complaint was filed, counsel for Plaintiff sent NVIDIA's counsel a version of the complaint that contained an allegation that Plaintiff visited the Website "on multiple occasions during the last four years, including in or around July 18, 2025." Dkt. 14-2 at PDF p. 64, ¶ 133.

Plaintiff attempts to cast doubt upon what he characterizes as the "speculation on top of speculation" in NVIDIA's motion by arguing that:  (1) the screenshots in the Complaint do not prove the date(s) Plaintiff visited the Website because they are merely "examples of a search bar on the Website" and are not alleged to be screenshots captured by Plaintiff; and (2) "websites typically do *not* display cookie banners to users who have previously set their cookie preferences" and therefore even if Plaintiff visited the Website in 2025 after previously visiting and rejecting cookies, NVIDIA has not established that Plaintiff would have seen one of the 2025 Cookie Banners.  Dkt. 28 at 6 (emphasis in original).  Plaintiff did not submit a declaration or other evidence addressing the date(s) he visited the Website or denying that the Website displayed a cookie banner.

Having carefully considered the arguments and evidence presented by both Parties, the Court finds that NVIDIA has satisfied its burden of demonstrating that Plaintiff saw one or both of the 2025 Cookie Banners when he visited the Website.  As outlined above, NVIDIA has presented evidence that Plaintiff visited the Website sometime on or after February 27, 2025.  Although Plaintiff criticizes NVIDIA for engaging in "speculation" about the dates of his website visits, he had an opportunity to submit a declaration in opposition to the motion to compel arbitration setting forth the dates when he visited the Website but did not do so.  Moreover, Plaintiff could have provided evidence not only of when he visited the Website but also of what search bar he saw there.  Plaintiff argues in a footnote that "the Complaint does not allege that the screenshot" in paragraph 38 of the Complaint "was captured  by Plaintiff, just that it is an example of a search bar on the Website, so it is not evidence of the date of a particular visit by Plaintiff."  *See* Dkt. 28 at 6 at n.1.  Paragraph 38 contains language that supports Plaintiff's argument:

United States District Court
Northern District of California

United States District Court
Northern District of California

> The Website includes search bars and forms where users input information. ***For example***, below are screenshots of the search bar on the Website where users can type into the search bar to cause the Website to search its contents.

Dkt. 1 ¶ 38 (emphasis added). However, a reasonable reading of paragraph 39 is that Plaintiff in fact did use the search bar depicted in paragraph 38:

> 39. ***When Plaintiff and other Website users input the information into the search bar***, they are intending to communicate with the Website the contents of the search to receive the information they are interested in.

Dkt. 1 ¶ 39 (emphasis added).

"Where plaintiffs do not offer any testimony or evidence to rebut a defendant's evidence, [] courts generally reject such challenges to the sufficiency of a defendant's evidence." *White v. PayPal Holdings Inc.*, -- F. Supp. 3d --, 2026 WL 496712, at *4 (N.D. Cal. 2026); *see also Singh v. Adobe Inc.*, 797 F. Supp. 3d 1038, 1046 (N.D. Cal. 2025) (holding that company satisfied its burden of demonstrating what users would have seen on its website because Plaintiffs "neither dispute that the screenshots offered by [defendant's employee in a declaration] are the same as what they saw nor offer any evidence regarding what they saw"); *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 990 (N.D. Cal. 2017) (holding that plaintiff had failed to raise a genuine issue of material fact as to whether he was on notice of defendant's terms and conditions because he "offers no testimony or evidence regarding what he *did* see on his screen, and offers no evidence to rebut [defendant's] reasoned declaration other than his own conclusory allegations that he never received notice of the terms and conditions and that [defendant's] declaration is false and inadequate" (emphasis in original)). Plaintiff's failure to provide competent evidence directly rebutting NVIDIA's evidence concerning the date of his visits to the Website therefore "fails to create a genuine issue" as to whether the 2025 Cookie Banners were presented to Plaintiff when he visited the Website. *See White*, 2026 WL 496712, at *4.

Plaintiff also argues that even if he visited the Website in 2025, it might not have displayed a cookie banner if he previously declined cookies on the Website. Dkt. 28 at 6. In support of this argument, Plaintiff cites a blog article entitled *"GDPR Cookie Compliance 101: How to Manage EU Users' Consent,"* which states that "[s]ite owners may not resubmit a consent banner to users

11

who denied it at each new access to the website." *Id.* However, this article provides advice as to how websites should handle cookie consent to comply with the European Union's General Data Protection Regulation (GDPR), which "contains some of the strictest cookie requirements in the world." https://cheq.ai/blog/gdpr-cookie-compliance-101/ (last visited 5/14/2026). This 2023 article about designing a website to meet EU requirements does not create a genuine dispute of fact regarding how NVIDIA's cookie banners operated for visitors from California in 2025. Again, Plaintiff has elected not to provide a declaration denying that he saw a cookie banner when he visited the Website. In fact, Plaintiff's Complaint indicates otherwise because it repeatedly states that a cookie banner was displayed when he visited the Website. *See, e.g.,* Dkt. 1 ¶¶ 1, 27.

In conclusion, NVIDIA met its burden to establish that Plaintiff saw one or both of the 2025 Cookie Banners when he visited the Website.

### 2. Plaintiff's Notice of NVIDIA's Terms of Service

"To form a contract under California law, there must be actual or constructive notice of the agreement, and the parties must manifest mutual assent." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1013–14 (9th Cir. 2024) (citing *Oberstein,* 60 F.4th at 512-13). In this section III.B.2., the Court considers whether NVIDIA has shown that Plaintiff had actual or constructive notice of the Terms of Service containing the arbitration agreement. The issue of whether NVIDIA has shown Plaintiff manifested mutual assent is addressed below in section III.B.3.

#### a. Actual notice

NVIDIA argues that "Plaintiff's admission that he saw and interacted with the [cookie] banner establishes that he was on actual notice of the Terms of Service and, in turn, the arbitration agreement." Dkt. 14 at 14. In *Nguyen,* the Ninth Circuit noted that courts have consistently enforced online agreements "where the user had actual notice of the agreement." 763 F.3d at 1176. The Ninth Circuit cited several cases in support of this proposition. In one cited case, *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 401–04 (2d Cir. 2004), the court in considering a motion for preliminary injunction found the website operator was likely to succeed on its claim that the defendant website user frequently visited the website to obtain data and "admitted that, in entering [the website] to get the data, it was fully aware of the terms on which [the website

12

operator] offered the access." In other cases cited by the Ninth Circuit in *Nguyen* as examples of actual notice, courts found defendants were on notice after receiving letters concerning website terms and conditions sent on behalf of the website operators. *See Ticketmaster Corp. v. Tickets.Com, Inc.,* No. CV–997654, 2003 WL 21406289, at \*2 (C.D. Cal. Mar. 7, 2003); *Southwest Airlines Co. v. Boardfirst, L.L.C.,* No. 3:06-CV-0891-B, 2007 WL 4823761, at \*4–6 (S.D. Tex. Sep. 12, 2007).

Plaintiff's admissions in the Complaint as well as the nature of his claims in this litigation adequately demonstrate that he had actual notice of the Terms of Service containing the arbitration agreement. Paragraph 136 of the Complaint states that "[w]hen Plaintiff visited the Website, the Website immediately detected that he was a visitor in California and ***presented him with Defendant's popup cookie consent banner***, which provided the option to select the 'Manage Cookies' button." Dkt. 1 ¶ 136 (emphasis added).[3] Plaintiff further admits that he "***viewed*** Defendant's representation on the popup cookie consent banner that, 'NVIDIA uses cookies to enable and improve the use of the website. Please see our Cookie Policy for more information. You can manage your cookie settings by clicking "Manage Cookies" or going to the NVIDIA Privacy Center.'" *Id.* (emphasis added). He also admits that he "***saw*** that, rather than choosing to accept such cookies by clicking or selecting the 'I Understand' button, users apparently could instead choose to 'Manage Cookies' by clicking or selecting the button to do so.: *Id.* (emphasis added). Elsewhere in the Complaint, Plaintiff reiterates that he "***reviewed*** the popup cookie consent banner and Cookie Settings window prior to using the website." Dkt. 1 ¶ 142 (emphasis added). Accordingly, Plaintiff admits that he was presented with and reviewed the cookie banner.

This critical admission is not a mere oversight nor is it irrelevant to the Complaint. Plaintiff's claim that he reviewed the contents of the cookie banner forms part of the basis of his claims in this litigation. For example, Plaintiff alleges that "Defendant's popup cookie consent banner and Cookie Settings window led Plaintiff, and all those Website users similarly situated, to

---

[3] As discussed in section III.B.1. above, although the Complaint does not admit that Plaintiff saw one of the 2025 Cookie Banners containing a link to the Terms of Service, NVIDIA has adequately demonstrated that he did, and Plaintiff does not rebut NVIDIA's evidence.

United States District Court
Northern District of California

believe that they declined 'All' cookies and tracking technologies, especially those used to 'understand where people most engage with links' and 'build a profile of [user] interests to show [users] relevant ads on other sites,'" and "[t]he banner further reasonably led Plaintiff and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the 'Decline All' cookies button." Dkt. 1 ¶ 30; *see also id.* ¶ 141 ("Then, as Plaintiff continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner and Cookie Settings window, and despite Plaintiff's clear declination of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing advertising and performance analytics from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff's Private Communications as Plaintiff browsed the Website").

The Complaint therefore alleges not only that Plaintiff saw and reviewed the cookie banner but also that he relied upon and was misled by representations made in the cookie banner. Plaintiff cannot pick and choose by claiming he saw the representations in the cookie banner regarding cookie use on the site but denying that he saw other representations in the cookie banner regarding NVIDIA's Terms of Service.

Accordingly, NVIDIA has demonstrated that Plaintiff had actual notice of the Terms of Service containing the arbitration agreement.

### b. Constructive notice

Plaintiff devotes a significant portion of his opposition brief to arguing that the reference to the Terms of Service in the 2025 Cookie Banners was not reasonably conspicuous (*see* Dkt. 28 at 7-9), but the conspicuousness requirement applies only to the issue of whether there is inquiry notice, *i.e.,* where there is no evidence of actual notice. *See Berman,* 30 F.4th at 856 ("Unless the website operator can show that a consumer has *actual* knowledge of the agreement, an enforceable

14

contract will be found based on an *inquiry* notice theory only if:  (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound …" (emphasis added)); *see also Dawson*, 2025 WL 1651940 at *1 (same).  As discussed in the preceding section, NVIDIA has shown that Plaintiff had actual notice of the Terms of Service containing the arbitration agreement.  Even if that is not so, however, NVIDIA has adequately demonstrated that Plaintiff was on inquiry notice.

"To avoid the unfairness of enforcing contractual terms that consumers never intended to accept, courts confronted with online agreements [] have devised rules to determine whether meaningful assent has been given." *Berman*, 30 F.4th at 856.  Courts commonly categorize online agreements on a "spectrum" ranging from "clickwrap" agreements to "browsewrap" agreements. *See Oberstein,* 60 F.4th at 513.  "Clickwrap agreements" are when "a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed."  *Id.* (citing *Berman*, 30 F.4th at 856); *see also Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 463 (2021) (describing a "clickwrap" agreement as one where "providers ask customers to agree to the terms, displayed somewhere on their website, by clicking on an 'I accept' or 'I agree' button").  "Courts routinely find clickwrap agreements enforceable." *Oberstein*, 60 F.4th at 513 (citations omitted). "At the other end of the spectrum are so-called 'browsewrap' agreements, in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Id.* (citations omitted).  "Courts are generally reluctant to enforce such agreements because they often leave users 'unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms.'" *Id.* (citations omitted).  However, there is no bright-line rule that browsewrap agreements are not enforceable. *Walsh v. Dollar Tree Stores, Inc.*, No. 25-CV-01601-SVK, 2025 WL 2939229, at *5–6 (N.D. Cal. Oct. 16, 2025).  Between these two extremes are agreements sometimes called "sign-in wrap," in which a user "is notified of the existence of the website's terms of use and advise[d] that by making some type of affirmative act, often by clicking a button, she is agreeing to the terms of service." *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 923 (N.D. Cal. 2024) (citation

United States District Court
Northern District of California

omitted).

In sum, to prove inquiry notice, NVIDIA must demonstrate "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th 856; *see also B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 944 (2022) (in context of contracts created by a consumer's interactions with a website "and in the absence of actual notice," inquiry focuses on whether a "manifestation of assent may be inferred from the consumer's actions on the website—including, for example, checking boxes and clicking buttons," which in turn depends on whether the "website puts the consumer on constructive notice of the contractual terms"). The issue of whether Plaintiff manifested his assent to the Terms of Service, which applies regardless of whether Plaintiff was on actual or inquiry notice of those terms, is addressed in section III.B.3. below.

In this section, the Court analyzes whether one or both of the 2025 Cookie Banners that Plaintiff saw when he visited the Website provide "reasonably conspicuous notice of the terms to which the consumer will be bound." *Berman*, 30 F.4th at 856. The test for whether notice is "reasonably conspicuous" has two aspects, both of which should be considered together: the "visual design" of the webpages and the context of the transaction. *Godun v. JustAnswer LLC*, 135 F.4th 699, 709 (9th Cir. 2025).

### i. Visual design

In evaluating inquiry notice, the Court first considers "visual conspicuousness," which is for the most part "a matter of whether an advisal is 'displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.'" *Godun*, 135 F.4th at 709 (citations omitted). "To examine whether textual notice is sufficiently conspicuous to put an individual on notice under California law, courts evaluate factors including: (1) the size of the text; (2) the color of the text compared to the background; (3) the location of the text and its proximity to where the user clicks to consent; (4) the obviousness of an associated hyperlink; and (5) other elements on the screen which clutter or obscure the textual notice." *In re Stubhub Refund Litig.*, No. 22-15879, 2023 WL 5092759, at *2 (9th Cir. Aug. 9, 2023) (citing

*Sellers*, 73 Cal. App. 5th at 473).

As shown in section I.B. above, both of the 2025 Cookie Banners contained a hyperlink to the Terms of Service that is underlined in green, include a parenthetical that the Terms of Service "contains important waivers," and state that a user accepts the Terms of Service by clicking one of the buttons on the banner. Dkt. 14-1 ¶¶ 6, 10. NVIDIA argues that these banners meet the notice requirement because they: "(i) appeared as a persistent pop-up displayed across the bottom of the Website's white background on a contrasting black banner; (ii) capitalized, hyperlinked, and underlined 'Terms of Service' in contrasting green font; and (iii) stated explicitly that by clicking any of the buttons, or, in the July 2025 version, by otherwise continuing to use the Website, the visitor 'accept[s] our Terms of Service (which contains important waivers)." Dkt. 31 at 6; *see also* Dkt. 14 at 7. NVIDIA also notes that "the Terms of Service hyperlink appears above the action buttons." Dkt. 31 at 7.

Plaintiff argues that the 2025 Cookie Banners do not provide sufficient notice to reasonable consumers that they were agreeing to the Terms of Service. Dkt. 28 at 7-9. Plaintiff acknowledges that the phrase "Terms of Service" is underlined but argues it is inadequate because the phrase: (1) is in the same font color as the other words in the paragraph and not in contrasting bright blue or green font; (2) is smaller than the larger, bolded text inside the action buttons; (3) is neither bolded nor in all capital letters; and (4) appears toward the end of a lengthy disclosure about the use of cookies. *Id.* at 7-8. In support of his argument, Plaintiff cites several cases in which courts have found statements that share some of these attributes to be inadequate. *Id.* at 8. Plaintiff also attempts to distinguish cases that NVIDIA cites on this issue. *Id.* at 9.

The notice provided by the 2025 Cookie Banners is distinguishable in significant respects from the notices found to be deficient in cases cited by Plaintiff. In *Chabolla,* because of "the notice's distance from relevant action items, its placement outside of the user's natural flow, and its font—notably timid in both size and color," it was "deemphasized by the overall design of the webpage" and not "prominently displayed." *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1157 (9th Cir. 2025) (quoting *Berman*, 30 F.4th at 857). The relevant text in *Serrano* appeared below the "Sign Up" action button, which was in "larger and darker text." *Serrano v. Open Rd. Delivery*

17

*Holdings, Inc.*, 666 F. Supp. 3d 1089, 1096 (C.D. Cal. 2023). Similarly, the relevant hyperlink found deficient in *Sellers,* although underlined, appeared in "extremely small print, outside the white box containing the payment fields where the consumer's attention would necessarily be focused." *Sellers,* 73 Cal. App. 5th at 481. Here, by contrast, the hyperlink to NVIDIA's Terms of Service appears within the cookie banner immediately above the action buttons.

In *Stubhub*, the Ninth Circuit found that a mobile registration screen did not adequately provide notice where it was "not obvious to the user that [relevant] text was hyperlinked." *Stubhub,* 2023 WL 5092759, at *2. In that case, the relevant hyperlinks were bolded but not underlined and were in gray text that did not stand out against the white background and that was "obscure[d]" by a bright pink sign-up button. *Id.* These criticisms do not apply to NVIDIA's banner to the extent that NVIDIA's Terms of Service hyperlink was underlined in a contrasting color that stood out against the black background of the banner, and the color scheme was consistent with and not obscured by the action buttons.

*Berman* and *Dawson* involved text in "a font so small it is barely legible to the naked eye" and "small text size" that was "difficult to read," respectively. *Berman*, 30 F.4th at 856-57; *Dawson,* 2025 WL 1651940, at *3. Here, by contrast, the Terms of Service phrase was in the same size font as the surrounding text.

Although cases such as those cited by the Parties are instructive and the Court has considered them, the Ninth Circuit has explained that the question of whether "the website provides reasonably conspicuous notice of the terms to which the consumer will be bound" is "fact-intensive" and informed by the "totality of the circumstances." *Godun*, 135 F.4th at 709 (citation omitted). As the Ninth Circuit cautioned:

> [W]e have not created a checklist for website designers. Nor have we generated per se design rules that must be followed for a contract to be formed between a website user and provider. "[T]here is no bright-line test for finding that a particular design element is adequate in every circumstance." *Chabolla*, 129 F.4th at 1156–57. And, by the same logic, there are not per se rules about what's necessarily inadequate, either. Such a one-size-fits-all approach would undermine the fact-intensive, totality-of-the-circumstances nature of the analysis.

*Id.* at 710. Under California law, "'even minor differences' in the design elements may make the

United States District Court
Northern District of California

difference in this fact-intensive analysis" so "[a]t bottom, when visually analyzing the conspicuousness of an advisal and any hyperlinks, courts must be tuned to the expectations of a reasonably prudent internet user." *Id.* (quoting *Sellers*, 73 Cal. App. 5th at 471, 481).

Viewed in light of the totality of the circumstances, the Court concludes that the visual attributes of the 2025 Cookie Banners provided a reasonably conspicuous notice of the Terms of Service to which users would be bound. First, NVIDIA has presented evidence that the 2025 Cookie Banners were persistent banners that would not disappear without engagement. Dkt. 14-1 ¶¶ 6, 10; *see also* Dkt. 14 at 8. Second, the advisal regarding acceptance of the Terms of Service "is conspicuously displayed directly above [] the action button[s]" on the persistent banner. *See Oberstein*, 60 F.4th at 516. Third, the text above the action buttons states that by clicking any of the buttons "you accept our Terms of Service (which contains important waivers)," which "clearly denotes" that taking that action "will act as a manifestation of the user's intent to be bound.'" *See id.* (quoting *Nguyen*, 763 F.3d at 1177). Fourth, the Terms of Service hyperlink is "conspicuously distinguished from the surrounding text" because it has initial capitalization, is underlined, and the underlining is in in contrasting green. *See Oberstein*, 60 F.4th at 516; *Berman,* 30 F.4th at 857. Fifth, Plaintiff admits he actually saw not only the cookie banner but the cookie advisal within the banner. *See, e.g.,* Dkt. 1 ¶ 136 ("Plaintiff viewed Defendant's representation on the popup cookie consent banner" concerning NVIDIA's use of cookies). That cookie advisal, although it appears earlier in the sentence containing the hyperlink to the Terms of Service, is the same as the Terms of Service advisal in font, underlining, and placement above the action buttons. *See* Dkt. 14-1 ¶¶ 6, 10. There is no reason why a reasonable consumer like Plaintiff should have noticed one advisal but not the other.

### ii.   Context of the transaction

In deciding whether a website user is on inquiry notice, courts also consider "the full context of the transaction, [] such as whether the type of transaction contemplates entering into a continuing, forward-looking relationship that would be governed by terms and conditions." *Godun,* 135 F.4th at 710 (internal quotation marks and citations omitted). On this issue, courts consider factors such as: (1) "whether the transaction contemplates a 'continuing relationship' by

United States District Court
Northern District of California

creating an account requiring a 'full registration process,'" (2) "whether the user is entering a free trial," (3) "whether a user enters credit card information," and (4) "whether the user has downloaded an app on their phone (suggesting consistent accessibility)." *Id.* (internal quotation marks and citations omitted). The Ninth Circuit has explained that "courts should expect that a reasonable internet user is more vigilant in looking for contract terms when the context of the transaction reasonably implies a contractual relationship." *Id.* at 709; *see also Hernandez v. Event Ticket Ctr., Inc.*, No. 2:24-cv-01983-DAD-AC, 2026 WL 618252, at *6 (E.D. Cal. Mar. 5, 2026) (courts "must consider both the context of the transaction and the placement of the notice," and "[c]ourts are more likely to enforce agreements with weak visual notices when the context of the transaction puts users on notice to look for a link to the terms of the relationship").

Plaintiff argues that his interactions with the Website were "in a context where a user would not be expecting to agree to arbitration and other contractual terms." Dkt. 28 at 8. Plaintiff asserts that he "was not seeking to enter into a continuing relationship with NVIDIA; to the contrary, by rejecting cookies, Plaintiff was seeking to keep his interactions with the Website as isolated as possible." *Id.* at 9. According to Plaintiff, "almost all websites use pop-up cookie banners at this point," so most users will either "automatically click one of the buttons without reading the preceding paragraph" or, if they begin reading the paragraph, "will quickly understand from the first few works that it is about cookies and then click one of the buttons without reading further." *Id.*

To be sure, this case does not involve a website user who created an account requiring a full registration process, entered credit card information, downloaded an app to his phone, or bought an automatically-renewing subscription. *See Godun*, 135 F.4th at 710, 712. However, in considering the context of Plaintiff's interactions with the Website, the Court must also take into account Plaintiff's admissions that he made repeat visits to the Website and that he "viewed Defendant's representation on the popup cookie banner." Dkt. 1 ¶¶ 133, 136-139. In fact, as discussed in section III.B.2.a. above, the very premise of Plaintiff's case against NVIDIA is that he reviewed and relied on statements in the cookie banner. Keeping in mind that the relevance of the context of the transaction is to help determine if "the website provides reasonably conspicuous

20

notice of the terms to which the consumer will be bound" (*Godun*, 135 F.4th at 709 (quoting *Keebaugh*, 100 F.4th at 1013)), the fact that Plaintiff admits that he viewed and relied on statements within the same banner that contained the link to the Terms of Service supports a finding that the disclosure provided reasonably conspicuous notice in this instance.  In any event, "the context of the transaction is a ***non-dispositive*** factor under California law used to evaluate whether a website's notice is sufficiently conspicuous."  *Keebaugh*, 100 F.4th at 1019 (emphasis added).

Under the facts and circumstances of this case, the Court therefore concludes that even if Plaintiff was not on actual notice of the Terms of Service containing the arbitration provision, he was on inquiry notice.

### 3.     Manifestation of Assent

As discussed in section III.B.2. above, NVIDIA has carried its burden of showing that Plaintiff was on actual or constructive notice of one or both of the 2025 Cookie Banners when he visited the Website.  The remaining question is whether NVIDIA has carried its burden of demonstrating that Plaintiff manifested his assent to the Terms of Service by clicking on a button on a 2025 Cookie Banner.  *See Godun*, 135 F.4th at 710.

NVIDIA contends that because Plaintiff alleges that his normal practice is to decline cookies, and he would have clicked "Manage Settings" or "Turn Off Optional Cookies" (depending on which version of the 2025 Cookie Banner he saw) and thereby accepted the Terms of Service.  Dkt. 14 at 8-11.[4]  Plaintiff argues that NVIDIA's showing on this issue involves speculation and is not supported by evidence that Plaintiff actually clicked either "Manage Settings" or "Turn Off Optional Cookies" in a 2025 Cookie Banner.  Dkt. 28 at 6.

Again, however, Plaintiff had an opportunity to submit a declaration or other evidence showing that he did not click a button on the cookie banner, but he did not do so.  Plaintiff's Complaint in fact relies on his allegation that he declined or turned off cookies on the Website.

---

[4] One version of the 2025 Cookie Banner states that a user agrees to the Terms of Service if he clicks one of the buttons or "[b]y continuing to use this site."  Dkt. 14-1 ¶ 6.  NVIDIA relies on Plaintiff's clicking one of the buttons on the banner, not his continued use of the Website, as the basis for its argument that he manifested assent to the Terms of Service.  *See* Dkt. 14 at 11.

United States District Court
Northern District of California

United States District Court
Northern District of California

*See, e.g.,* Dkt. 1 ¶ 137 ("Consistent with his typical practice in managing or otherwise declining the placement of cookies and tracking technologies, Plaintiff selected and clicked the 'Manage Cookies' button"). The 2025 Cookie Banners explicitly advise users that by clicking any button on the banner, they agree to NVIDIA's Terms of Service. Dkt. 14-1 ¶¶ 6, 10. Accordingly, Plaintiff's arguments in opposition to the motion to compel arbitration fail to create a genuine issue of material fact concerning whether he manifested assent to NVIDIA's Terms of Service.

Accordingly, NVIDIA has provided sufficient evidence showing that Plaintiff assented to the Terms of Service when he clicked a button on a 2025 Cookie Banner. By assenting to the Terms of Service, he also assented to the arbitration provision. *See Brown v. Madison Reed, Inc.*, No. 21-cv-01233-WHO, 2021 WL 3861457, at *6 (N.D. Cal. Aug. 31, 2021).

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion to compel arbitration at Dkt. 14 is **GRANTED** and this case is **STAYED** pending completion of arbitration. *Smith*, 601 U.S. at 478-79; 9 U.S.C. § 3.

In light of the Court's order compelling arbitration, Defendant's motion to dismiss at Dkt. 15 is **DENIED WITHOUT PREJUDICE**.

The Parties are **ORDERED** to file a joint status report by the earlier of: (1) 14 days from issuance of an arbitration award or (2) 90 days from the date of this Order.

The Clerk of Court shall administratively close the file in this matter. This is an internal procedure that does not affect the rights of the Parties.

**SO ORDERED.**

Dated: May 21, 2026

SUSAN VAN KEULEN
United States Magistrate Judge

22